**EFiled: May 26 2017 11:52AM EDT**
**Transaction ID 60650885**
**Case No. 10782-VCS**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| | : | |
| IN RE APPRAISAL OF PETSMART, INC. | : | **CONSOLIDATED** |
| | : | **C.A. No. 10782-VCS** |

## MEMORANDUM OPINION

Date Submitted: February 27, 2017
Date Decided: May 26, 2017

Stuart M. Grant, Esquire, Nathan A. Cook, Esquire, Kimberly A. Evans, Esquire, and Joseph L. Christensen, Esquire of Grant & Eisenhofer P.A., Wilmington, Delaware, Attorneys for Petitioners.

Gregory P. Williams, Esquire, Brock E. Czeschin, Esquire, John D. Hendershot, Esquire, Robert L. Burns, Esquire, Sarah A. Clark, Esquire, and Matthew D. Perri, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware, and Theodore N. Mirvis, Esquire, Rachelle Silverberg, Esquire, Adam M. Gogolak, Esquire, Adam D. Gold, Esquire, and Joshua J. Card, Esquire of Wachtell, Lipton, Rosen & Katz, New York, New York, Attorneys for Respondent PetSmart, Inc.

**SLIGHTS, Vice Chancellor**

I would not be the first to observe that the trial of an appraisal case under the Delaware General Corporation Law presents unique challenges to the judicial factfinder.[1]  The petitioner bears a burden of proving the "fair value" of his shares; the respondent bears a burden of proving the "fair value" of the petitioner's shares; and then the judge, as factfinder, assumes, in effect, a third burden to assign a particular value "as the most reasonable [] in light of all of the relevant evidence and based on considerations of fairness."[2]  The role assigned to the trial judge in this process independently to review "all relevant factors" that may inform the determination of fair value, if not unique, is certainly unusual.[3]  It is unusual in the sense that the judge is not bound by the positions on fair value espoused by either of

---

[1] *See In re Appraisal of Ancestry.com, Inc.*, 2015 WL 399726, at *2 (Del. Ch. Jan. 30, 2015); Albert H. Choi & Eric L. Talley, *Appraising the "Merger Price" Appraisal Rule* (Virginia Law and Economics, Working Paper No. 2017-01, Jan. 18, 2017).

[2] *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at *2 (Del. Ch. July 9, 2004), *aff'd in part, rev'd on other grounds*, 884 A.2d 26 (Del. 2005).

[3] 8 *Del. C.* § 262(h).  *See Ancestry.com*, 2015 WL 399726, at *1 (noting that the burdens of proof imposed by Section 262 makes the job of the judge "particularly difficult" and that the litigation structure imposed by the statute is "unusual"); Choi & Eric Talley, *supra*, at 2 (noting that the appraisal statute presents a "particularly vexing challenge" for the trial judge, *inter alia,* because it "allocates *no explicit burden of proof* and *requires* the court to deliver a single number at the end of the process") (emphasis in original).

the parties. Indeed, the trial court commits error if it simply chooses one party's position over the other without first assessing the relevant factors on its own.[4]

Yet it cannot be overlooked that the judge's decision in an appraisal case follows a trial—an honest-to-goodness, adversarial trial—where the parties are incented to present their best case, grounded in competent evidence, and to subject their adversary's evidence to the discerning filter of cross-examination. The trial court then reviews the evidence the parties have placed in the trial record and does its best to "distill the truth."[5] In this regard, at least, the appraisal trial is no different from any other trial. The court's determination of "fair value," while based on "all relevant factors," must still be tethered to the evidence presented at trial. The appraisal statute is not a license for judicial freestyling beyond the trial record.

This appraisal action follows a going-private merger in which the public stockholders of PetSmart, Inc. ("PetSmart," the "Company" or the "Respondent") received $83 per share in cash from a private equity acquiror, BC Partners, Inc. (the "Merger"). The Merger closed on March 11, 2015. Petitioners declined the Merger consideration and demanded appraisal.

---

[4] *See Gonsalves v. Straight Arrow Publ'rs, Inc.*, 701 A.2d 357, 362 (Del. 1997) (holding that the trial court's decision to adopt one of the parties' valuations of the company "hook-line-and-sinker" without considering all relevant factors was "fatally flawed").

[5] *See Finkelstein v. Liberty Digital, Inc.*, 2005 WL 1074364, at *24 n.56 (Del. Ch. Apr. 25, 2005).

The battle lines staked here rest on positions that are well-known to Delaware courts, the academy and those who otherwise follow the evolving state of Delaware appraisal litigation. The Respondent would have me determine fair value by deferring to the price paid by a third-party purchaser in an arm's-length transaction after an allegedly robust pre-signing auction process. The Petitioners insist that "deal price" is unreliable in this case for a variety of reasons and urge me to determine fair value by employing a tried and true valuation methodology, discounted cash flow ("DCF"). The experts engaged by the parties, both well credentialed, sponsor these differing views with unwavering commitment. Indeed, the parties are so certain of their respective positions on the fair value of PetSmart at the time of the Merger that they insist I disregard the other's proffered methodology entirely. The result: Respondent values PetSmart at $83 per share; Petitioners value the same firm at $128.78 per share.

In this post-trial opinion, I conclude that the evidence presented during trial points in only one direction—Petitioners have failed to carry their burden of persuasion that a DCF analysis provides a reliable measure of fair value in this case. The management projections upon which Petitioners rely as the bedrock for their DCF analysis are, at best, fanciful and I find no basis in the evidence to conclude that a DCF analysis based on other projections of expected cash flows would yield a result more reliable than the Merger consideration. Nor is there a foundation in

3

the evidence for concluding that some other valuation methodology might lead to a reliable determination of fair value. On the other hand, I am satisfied Respondent has carried its burden of demonstrating that the process leading to the Merger was reasonably designed and properly implemented to attain the fair value of the Company. Moreover, the evidence does not reveal any confounding factors that would have caused the massive market failure, to the tune of $4.5 billion (a 45% discrepancy), that Petitioners allege occurred here. Based on my review of all relevant factors, as found in the evidence, I am satisfied that the deal price of $83 per share, "forged in the crucible of objective market reality,"[6] is the best indicator of the fair value of PetSmart as of the closing of the Merger.[7]

## I. BACKGROUND

I recite the facts as I find them by a preponderance of the evidence after a four-day trial beginning in October 2016. That evidence consisted of testimony from seventeen witnesses (thirteen fact witnesses, some presented live and some by deposition, and four live expert witnesses) along with over 2300 exhibits. To the

---

[6] *Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *17 (Del. Ch. Mar. 7, 1991).

[7] To preserve its record, Respondent has asked me to decline to follow the now-settled precedent of this Court that establishes the right of a petitioner to seek appraisal of shares acquired after the record date by demonstrating that the number of shares held by the record holder and not voted in favor of the merger exceeds the number of shares upon which appraisal is sought. *See In re Transkaryotic Ther., Inc.*, 2007 WL 1378345 (Del. Ch. May 2, 2007). The issue is preserved but I decline to revisit this precedent.

4

extent I have relied upon evidence to which an objection was raised but not resolved at trial, I will explain the bases for my decision to admit the evidence at the time I first discuss it.

## A. Parties and Relevant Non-Parties

Respondent, PetSmart, Inc., is a Delaware corporation with headquarters in Phoenix, Arizona.[8] It is one of the largest retailers of pet products and services in North America.[9] Prior to the Merger, PetSmart's stock traded on NASDAQ.[10] On March 11, 2015, PetSmart was acquired by a consortium of funds advised by BC Partners, Inc. and certain other investment firms for $83.00 cash per share (the "Merger Price") in a merger.[11] In connection with this transaction, PetSmart merged into Argos Merger Sub Inc., with PetSmart surviving as a wholly owned subsidiary of Argos Holdings Inc.[12]

Petitioners are CF Skylos I LLC, CF Skylos II LLC, Third Point Reinsurance (USA) Ltd., Third Point Reinsurance Company Ltd., Third Point Partners Qualified L.P., Third Point Offshore Master Fund L.P., Third Point Partners L.P., Third Point

---

[8] Stipulated Joint Pre-Trial Order ¶ 77 ("PTO").

[9] PTO ¶¶ 78, 116; JX 1336 at 23.

[10] PTO ¶ 79.

[11] PTO ¶ 1.

[12] *Id.*

Ultra Master Fund L.P., Farallon Capital Partners, L.P., Farallon Capital AA Investors, L.P., Farallon Capital (AM) Investors, L.P., Farallon Capital Institutional Partners, L.P., Farallon Capital Institutional Partners II, L.P., Farallon Capital Institutional Partners III, L.P., Farallon Capital Offshore Investors II, L.P., Noonday Offshore, Inc., Muirfield Value Partners LP, HCN L.P., CAZ Halcyon Strategic Opportunities Fund L.P., Halcyon Mount Bonnell Fund L.P., Merlin Partners, LP, and AAMAF, LP (collectively, "Petitioners").[13] Petitioners were stockholders of PetSmart as of the Merger date and collectively held 10,713,225 shares of PetSmart common stock.[14]

## B. The Company

Founded in 1987, PetSmart is a pet specialty retailer.[15] Its business consists of providing pet products, including consumables and hardgoods,[16] as well as pet services such as pet grooming and boarding.[17] At the time of the Merger, PetSmart operated 1,404 stores in the United States, Canada, and Puerto Rico and had annual

---

[13] PTO ¶¶ 15–16, 19, 24–30, 36–44, 51, 55, 60–62, 64, 69–72.

[14] PTO ¶¶ 15–16, 19, 24–30, 36–44, 51, 55, 60–62, 64, 69–72. Most of these shares were acquired after the record date of January 29, 2015. *See* PTO ¶¶ 18, 31, 45, 53, 63, 71.

[15] PTO ¶ 117.

[16] Pet "consumables" include "pet food, pet treats and snacks, and pet litter products." JX 2307 (Weinsten-Opening) at 12. Pet "hardgoods" include "pet toys, apparel, collars, leashes, grooming equipment, food bowls and pet beds." *Id.*

[17] PTO ¶ 78; JX 1336 at 23; JX 1477.

revenues of approximately $7 billion.[18] The only other company in North America that does what PetSmart does on the same scale is Petco Animal Supplies, Inc. ("Petco").[19] PetSmart also faces competition from big box stores like Target and WalMart, grocery stores like Kroger, smaller chain and independent pet stores and online retailers like Amazon.[20]

## C. PetSmart Experiences Strong Growth from 2000–2012

PetSmart experienced significant positive growth each year from 2000 to 2012.[21] From 2000 to the onset of the financial crisis in 2007, PetSmart achieved annual revenue growth of 8–13%, significantly outperforming the retail industry as a whole.[22] PetSmart's annual revenue growth rate declined in 2008 and 2009 (falling to 5% in 2009) during the peak of the financial crisis but soon rebounded, reaching 11% in 2012.[23]

PetSmart's growth was driven in significant part by favorable dynamics in the pet industry from 2000 to 2008 coupled with PetSmart's rapid increase in new store

---

[18] JX 1336 at 23.

[19] PTO ¶ 118.

[20] Trial Tr. 181:13–182:24 (Teffner).

[21] JX 1697 (Metrick-Opening) at 15–16, Ex. 1A, Ex. 3; *see* Trial Tr. 177:1–7 (Teffner).

[22] JX 1697 (Metrick-Opening) at 15–16, Ex. 1A, Ex. 3; *see* JX 1698 (Dages-Opening) at 3–6; Trial Tr. 177:1–7 (Teffner).

[23] JX 1697 (Metrick-Opening) at 15–16, Ex. 1A, Ex. 3.

openings.[24]  From 2000 to 2008, the pet industry benefitted from the convergence of two industry-favorable trends: an increasing pet population in North America and increasing spending per pet by North American pet owners due to the trend described as pet "humanization."[25]  The period from 2000 to 2008 also saw PetSmart more than double the number of its stores, from 484 stores in 2000 to 1,004 stores at the start of 2008.[26]  PetSmart's store expansion was particularly rapid from 2004 to 2008, when PetSmart opened 518 new stores.[27]  As these new stores grew to their full sales potential, PetSmart experienced a strong increase in its comparable store sales growth from 2009 to 2012.[28]

---

[24] JX 1698 (Dages-Opening) at 6–7; *see* Trial Tr. 177:8–178:11 (Teffner).

[25] JX 1697 (Metrick-Opening) at 11–14; JX 1698 (Dages-Opening) at 3–4; Trial Tr. 177:8–178:11 (Teffner); PTO ¶ 121.  Pet "humanization" describes owners treating their pets as members of the family.  *Id.*  This, in turn, prompts owners to seek out premium pet foods and products of a quality they might buy for themselves or other family members. PTO ¶ 122.

[26] JX 1697 (Metrick-Opening) at Ex. 4.

[27] *Id.*

[28] JX 1697 (Metrick-Opening) at 16, 19; JX 2307 (Weinsten-Opening) at 56, Ex. 18; JX 1698 (Dages-Opening) at 6.  "Comparable stores sales growth" (or "comp") is the percentage growth in sales revenue period-over-period (*e.g.*, year-over-year or quarter-over-quarter) for a retailer's existing stores, "excluding new [stores] during their first year, remodeled [stores] and [stores] that have since closed."  JX 2307 (Weinsten-Opening) at 15. Comparable store sales growth (as between two different time periods of equal duration) is calculated by multiplying (1) the change period-over-period in the total number of customer purchase transactions for existing stores *by* (2) the change period-over-period in average dollars per consumer purchase transaction for those existing stores. *Id.* at 15–

8

### D. PetSmart's Performance Declines

PetSmart's growth began to stall in 2012.[29]  Between Q1 2012 and Q4 2013, PetSmart's comparable store sales growth declined from 7.4% (in Q1 2012) to 1.4% (in Q4 2013), and PetSmart's overall sales growth exhibited a general downward trend.[30]  During this same period, PetSmart found itself facing increasing competition and other headwinds on multiple fronts.[31]  Along with this decline, PetSmart struggled accurately to project its future performance, even quarter-by-quarter.  Indeed, management's forecasts were often off by large margins.[32]

PetSmart also experienced substantial management turnover in 2013 and early 2014.  In June 2013, PetSmart's CEO and CFO both resigned.[33]  David Lenhardt, who had previously served as PetSmart's President and COO, became PetSmart's

---

16.  Comparable store sales growth is a metric that features prominently in the discussion of PetSmart's fair value.

[29] JX 1697 (Metrick-Opening) at Ex. 1A.

[30] *Id.* at 20, Fig. 4, Ex. 2.

[31] Trial Tr. 183:5–186:17 (Teffner); Trial Tr. 396:23–397:18 (Gangwal).

[32] *See* JX 1697 (Metrick-Opening) at 64–65, Fig. 11.  *See also* Trial Tr. 1172:22–1178:4 (Weinsten) (describing PetSmart's historical difficulties in meeting its near-term forecasts, and how this affected his view of the reliability of the Management Projections because "[i]t's easier to forecast in the near term.  It's even easier forecasting in the near term when you have actual results available that factor into the calculation.  So projecting out over a five-year period is significantly more difficult").

[33] JX 153 at 2; JX 137 at 4; PTO ¶¶ 101, 103.

new CEO, and Carrie Teffner joined PetSmart as its new CFO.[34] PetSmart's then-President and COO, Joseph O'Leary, left the Company in April 2014.[35]

New management pushed initiatives that precipitated additional difficulties for PetSmart. In particular, under Lenhardt's direction, PetSmart implemented a major "consumables reset" in early 2014 through which it increased store space for exclusively distributed premium pet foods while reducing space for widely distributed value pet foods.[36] This consumables reset was intended to drive growth in PetSmart's sales and margins.[37] As reflected in PetSmart's disappointing Q1 2014

---

[34] PTO ¶¶ 99–101, 103.

[35] PTO ¶ 169.

[36] PTO ¶ 135.

[37] *See* Trial Tr. 246:20–23 (Teffner); JX 1684 (Lenhardt Dep.) 50:14–16, 51:20–52:7; PTO ¶ 171. Petitioners object to the admission of Lenhardt's deposition on hearsay and related grounds. Pursuant to Court of Chancery Rule 32(a)(3)(B), deposition transcripts may be used "by any party for any purpose" in lieu of live witness testimony when "that witness is out of the State of Delaware, unless it appears that the absence of the witness was procured by the party offering the deposition." When Rule 32 applies to permit the use of deposition testimony, "the Rules of Evidence are 'applied as though the witness were then present and testifying[,]' . . . [such that] a party cannot raise evidentiary objections to admissibility based on the fact that the testimony takes the form of a deposition." *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 75851, at *3 (Del. Ch. Jan. 9, 2017). Rule 32 allows Respondents to offer Lenhardt's deposition testimony as he is "out of the state of Delaware" and there is no evidence that the Respondent procured his absence. Importantly, procuring the absence of a witness from trial is different from "doing nothing to facilitate presence," even where potential witnesses are employed by one of the parties to the trial. *Carey v. Bahama Cruise Lines,* 864 F.2d 201, 204 (1st Cir. 1998) (quoting *Houser v. Snap-On Tools Corp.*, 202 F. Supp. 181, 189 (D. Md. 1962)). To have procured the absence for the purposes of Rule 32, the party must have "actively [taken] steps to keep the deponent[] from setting foot in the court-room." *Carey*, 864 F.2d at 204. Respondent also demonstrated that the witness is "unavailable" pursuant to DRE 804(a)(5)

10

results, announced on May 21, 2014, the consumables reset failed.[38] PetSmart's comparable store sales growth for Q1 2014 had declined to -0.6%, and its Q1 2014 net sales growth was only 1.1%.[39]

Following PetSmart's announcement of its Q1 2014 results, PetSmart's stock price dropped 8% to $57.02.[40] PetSmart's Q1 2014 results, combined with the sharp decline in its stock price, drew the ire of shareholders, including Longview Asset Management LLC ("Longview"), then PetSmart's largest stockholder. Longview was not bashful in communicating its frustration with PetSmart's lackluster performance to both members of management and PetSmart's board of directors (the "Board").[41]

### E. PetSmart's Board Begins to Explore Strategic Alternatives

At a meeting on June 18, 2014, the Board received reports on Longview's most recent communications and PetSmart's poor results in Q1 2014.[42] Morgan

---

& 804(b)(1). This reasoning applies with equal force to the use of the deposition testimony of Christina Vance, Kim Smith and Michael Chang, all of whom were "out of the State of Delaware" at the time of trial through no active involvement of the Respondent.

[38] PTO ¶ 171.

[39] *Id.*

[40] *Id.*; JX 1623.

[41] *E.g.*, Trial Tr. 193:10–195:18 (Teffner); PTO ¶ 170.

[42] PTO ¶¶ 176–78.

Stanley had been engaged to advise the Board regarding its options in the wake of recent events and, at the June 18 meeting, it gave a presentation on PetSmart's valuation, capital structure and potential strategic alternatives.[43]

In anticipation of the June 2014 meeting, PetSmart had provided Morgan Stanley with PetSmart's strategic plan and a set of financial projections prepared by PetSmart's management (the "June 2014 Projections"). The June 2014 Projections were "very high level,"[44] created "specifically for Morgan Stanley,"[45] and prepared in "[r]elatively short order, in a matter of maybe not even a week"[46] using management's general financial planning framework (the "fishbone" or "financial framework").[47] These projections had not been approved by PetSmart's Board and

---

[43] PTO ¶¶ 176–80.

[44] Trial Tr. 198:12 (Teffner).

[45] Trial Tr. 197:17–18 (Teffner).

[46] Trial Tr. 198:18–19 (Teffner).

[47] Trial Tr. 197:21–198:9 (Teffner). Teffner testified that PetSmart's management used the financial framework to outline its expectations with respect to "revenue growth, how much of that was comp, how much of that was new store growth . . . margin, profit, CAPX, those type of things." Trial Tr. 198:3–6 (Teffner); Trial Tr. 208:20–22, 209:20–210:12 (Teffner). *See also* JX 1674 (Vance Dep.) 42:2–12, 43:15–20 ("The format of [the fishbone was] a single piece of paper that has some boxes on it that have little numbers on it that say sales should grow three to four percent, margins should be flat, expenses should grow, you know . . . three to four percent, something like that."), 46:1–4 ("The [fishbone] itself is not a plan. It's a piece of paper that says here's what we aspire to achieve, but it's not an individual plan.").

were not intended to inform PetSmart's business operations going forward.[48] Rather, the June 2014 Projections were prepared "to be in line with what the board would have expected from the financial framework, but [also] to give them directional guidance in terms of what the impact of leveraging up to do a significant share buyback would do."[49]

Having reviewed PetSmart's strategic plan and the June 2014 Projections, Morgan Stanley presented the following "preliminary conclusions" to PetSmart's Board at the June 2014 meeting: (1) "Based on management's forecasts and [PetSmart's] recent share price decline, [PetSmart's] stock appeared to be undervalued";[50] (2) "PetSmart could optimize its capital structure and lower its cost of capital by raising debt to accelerate its return of capital while still maintaining strategic flexibility";[51] and (3) "Given [PetSmart's] compelling cash flow and return characteristics . . . , Morgan Stanley expected financial sponsors to be interested in a take-private transaction [*i.e.*, a leveraged buyout ("LBO")]."[52] Morgan Stanley's presentation to the Board also included a preliminary assessment of PetSmart's value

---

[48] Trial Tr. 198:20–199:1 (Teffner).

[49] Trial Tr. 199:5–9 (Teffner).

[50] PTO ¶ 179(c)(i).

[51] PTO ¶ 179(c)(ii).

[52] PTO ¶ 179(c)(iii).

based on a DCF analysis, which yielded a range of valuations for PetSmart of $100 per share (upside), $88 per share (base), and $77 per share (downside).[53]

Following Morgan Stanley's presentation, the Board discussed a range of possible strategic options, including: (1) adhering to management's current strategic and operating plans; (2) engaging in a significant leveraged recapitalization (as described by Morgan Stanley); (3) pursuing an acquisition of Pet360, Inc. ("Pet360"), an online pet business; (4) pursuing a strategic combination with Petco; or (5) pursuing a sale of the Company to a financial buyer.[54] At the end of the June 2014 meeting, the Board established an Ad Hoc Advisory Committee of non-executive, independent directors: Gregory Josefowicz, Rakesh Gangwal, and Thomas Stemberg.[55] The Board established the Ad Hoc Committee to work with management and PetSmart's advisors to evaluate options that would increase shareholder value (including a leveraged recapitalization) and to develop one or more related proposals for consideration by the Board.[56] One of the goals in forming

---

[53] PTO ¶ 180.

[54] PTO ¶ 178; Trial Tr. 400:12–16 (Gangwal).

[55] PTO ¶ 181. The three members of the Ad Hoc Committee were each experienced board members and former CEOs (Josefowicz was the former CEO of Borders, Gangwal was the former CEO of US Airways, and Stemberg was the former CEO of Staples). JX 276 at 15–16.

[56] PTO ¶ 182.

14

the Ad Hoc Committee was to relieve some of the pressure from PetSmart's "young management team" during the Company's exploration of strategic alternatives since management "was already under a lot of pressure to perform."[57]

### F. Activist Investor JANA Partners Discloses Stake in the Company and Urges Sale

On July 3, 2014, JANA Partners LLC ("JANA"), an activist hedge fund, disclosed in a Schedule 13D filing that it had acquired a 9.9% stake in PetSmart.[58] JANA stated its view that PetSmart's stock was undervalued and disclosed its intention to push PetSmart to pursue strategic alternatives including a possible sale.[59] Four days later, on July 7, 2014, Longview publicly disclosed a letter it had sent to the Board in response to JANA's filing that also encouraged the Board to pursue a possible sale of the Company in addition to examining other strategic alternatives.[60]

On July 10, 2014, JANA representatives met in person with Lenhardt, Teffner, and Josefowicz.[61]  At that meeting, JANA's representatives criticized PetSmart's Board and management for pricing missteps, ineffective cost management, failure

---

[57] Trial Tr. 402:16–403:9 (Gangwal).

[58] PTO ¶ 188; JX 386.

[59] PTO ¶ 188; JX 386 at 2–3.

[60] PTO ¶ 190; JX 427; JX 403; Trial Tr. 462:14–15 (Gangwal).

[61] PTO ¶ 192.

to capitalize on growth opportunities and failure to respond adequately to competitors.[62] In light of these failures, JANA's view was that PetSmart's only solution was to sell the Company.[63] That same day, Longview reiterated to PetSmart its support for a possible sale of the Company.[64]

On July 11, 2014, the Board held a special meeting via telephone.[65] During the meeting, the Board received a report on recent shareholder communications from JANA and Longview and, with management's recommendation, authorized the retention of J.P. Morgan Securities LLC ("JPM") as PetSmart's new financial advisor.[66] A team from JPM led by Anu Aiyengar presented JPM's preliminary analysis of PetSmart's current situation and possible strategic alternatives.[67] This presentation included an overview of preliminary valuation perspectives, selected capital alternatives and selected strategic alternatives such as a possible going-

---

[62] *See* Trial Tr. 201:24–202:9 (Teffner); Trial Tr. 404:9–19 (Gangwal); JX 427 at 1–2; JX 433.

[63] *See* Trial Tr. 201:24–202:9 (Teffner); JX 427 at 2; JX 433.

[64] PTO ¶ 193; JX 427 at 2; Trial Tr. 462:14–15 (Gangwal).

[65] PTO ¶ 194.

[66] PTO ¶¶ 191, 194–95; JX 427 at 4–5. According to the July 2014 meeting minutes, the Board resolution authorizing JPM's retention as PetSmart's financial advisor provided that the Ad Hoc Committee (1) was to determine the scope and terms of that retention; and (2) then negotiate with JPM to reach the final terms of its engagement. JX 427 at 4–5.

[67] JX 427 at PETS_APP00000314–315; Trial Tr. 882:20–22 (Aiyengar).

private transaction or the acquisition of Petco.[68] JPM also discussed certain steps that it would undertake to assist the Board in evaluating alternatives and making a decision, which included: (1) reviewing and performing due diligence on PetSmart's business plan, which management had provided to JPM; (2) assessing trends in the pet sector; (3) asking strategic questions about possible changes to PetSmart's business plan; (4) evaluating capital and structural changes that could be considered in connection with that plan, as alternatives to a sale of the business; (5) considering acquisition scenarios; (6) comparing the potential value to shareholders of executing PetSmart's business plan (including recommending possible modifications and capital and structural changes) with the potential value to stockholders of a sale of PetSmart, and (7) assessing which of these or other alternatives was more likely to maximize shareholder value.[69] While JANA had threatened a proxy fight if PetSmart decided not to sell, the Board indicated to JPM that it was prepared to take on that fight if it decided that a sale was not in the best interests of the Company.[70]

---

[68] PTO ¶ 196; Trial Tr. 204:17–21 (Teffner).

[69] PTO ¶ 197; Trial Tr. 882:20–22 (Aiyengar); JX 372; JX 427 at 3.

[70] Trial Tr. 405:8–406:1, 467:5–6 (Gangwal).

17

## G. PetSmart's Management Prepares Long-Term Projections

Following the July 11 meeting, PetSmart's management began to prepare a set of long-term projections at the direction of the Board (the "Base Case").[71] This project was led principally by PetSmart CFO Carrie Teffner, Christina Vance, PetSmart's director of financial planning, and Kim Smith, PetSmart's director of treasury operations—with input from Lenhardt and several other executives.[72]

PetSmart did not prepare long-term projections in the ordinary course to operate its business.[73] Instead, PetSmart's management would create a one-year budget (or operating plan) which forecasted PetSmart's quarterly performance for the upcoming year.[74] The budget formulation process began each summer with a series of meetings over several days referred to within the Company as "Summer Strategy."[75] During these meetings, PetSmart's management discussed financial and strategic priorities for the next fiscal year.[76] Prior to each Summer Strategy, the

---

[71] Trial Tr. 217:10–17, 229:2–6 (Teffner); JX 1674 (Vance Dep.) 105:18–112:8.

[72] Trial Tr. 220:1–18, 221:22–222:1 (Teffner).

[73] *See* Trial Tr. 209:4–6 (Teffner) (Q: "Did PetSmart senior management prepare long-term projections to operate its business?" A: "No."); Trial Tr. 211:8–14, 211:21–23 (Teffner).

[74] PTO ¶ 433; Trial Tr. 206:21–209:3 (Teffner).

[75] Trial Tr. 205:14–209:3 (Teffner); PTO ¶ 424.

[76] *Id. See also* JX 149 (presentation slides from 2013 Summer Strategy "Lead Meeting 4"); JX 150 (presentation slides from 2013 Summer Strategy business case prioritization

leaders of PetSmart's different business segments would identify potential initiatives for the upcoming fiscal year and, working with members of PetSmart's finance department, develop "business cases" around those initiatives.[77] Each business case for a proposed initiative would include certain financial forecasts.[78] The business segment leaders would then present their proposed business initiatives (and business cases) to the Company's senior management during the Summer Strategy meetings.[79] Management, in turn, would select (and approve) specific initiatives for advancement in the upcoming fiscal year.[80]

Following Summer Strategy, PetSmart's management would continue to evaluate the approved initiatives through the fall and early winter to determine their expected impact on PetSmart's revenue and expenses.[81] Typically, management would then complete the one-year budget in February of the following calendar year,

---

meeting); JX 156 (presentation slides from 2013 Summer Strategy business case prioritization review meeting).

[77] Trial Tr. 205:16–206:5 (Teffner); PTO ¶ 425–27.

[78] PTO ¶ 431. "While business cases [used] multiyear looks [*i.e.*, projections] . . . , the focus was really on Year 1 and what we were going to wind up putting in the budget for the following year." Trial Tr. 206:12–14 (Teffner).

[79] Trial Tr. 206:6–10 (Teffner).

[80] Trial Tr. 206:23–207:12 (Teffner).

[81] Trial Tr. 206:23–207:17 (Teffner); PTO ¶ 434. PetSmart's fiscal year runs from February 1 to January 31. PTO ¶ 80.

present it to the Board in March of that year and the Board would approve it that same month.[82] Thereafter, before Q2, Q3 and Q4 of the fiscal year, management would prepare reforecasts of PetSmart's projected performance for the remaining quarters.[83] PetSmart used the one-year budgets and reforecasts "to run the business and incentivize management."[84]

Over time, Vance had developed a model to extrapolate the business cases presented at Summer Strategy.[85] She used her model to evaluate whether PetSmart "would stay within [its] financial framework."[86] The model was not, however, "presented to the board for approval . . . [and was not] considered a multiyear projection that the business relied upon."[87] Rather, it "was more of an inherent working tool for the planning department . . . ."[88]

PetSmart management confronted several challenges when the Board tasked them with developing the long-term projections to be used by JPM and the Board in

[82] PTO ¶¶ 434–35; Trial Tr. 207:18–208:3 (Teffner).

[83] PTO ¶ 440.

[84] Trial Tr. 211:18–19 (Teffner); PTO ¶¶ 438–42.

[85] Trial Tr. 213:7–19 (Teffner); JX 1674 (Vance Dep.) 38:12–41:24.

[86] Trial Tr. 213:12–13 (Teffner). *See also* JX 1674 (Vance Dep.) 38:12–42:12.

[87] Trial Tr. 213:15–19 (Teffner).

[88] Trial Tr. 213:16–17 (Teffner).

their evaluation of strategic alternatives. First and foremost, they had never prepared long-term projections and the process of doing so was vastly different than the process employed to prepare budgets for Summer Strategy.[89] The business units were unable to provide much input because they had never prepared and had never been accountable for long-term projections.[90] And then there was the time pressure. The Board rushed management to prepare the Base Case "in the span of a few days" after the Board meeting on July 11, 2014, so that the results could be presented at the next Board meeting in August.[91]

During PetSmart's 2014 Summer Strategy, management had "identified a variety of initiatives that [management] thought would be go-forward initiatives to help drive growth going forward."[92] Thus, in creating the Base Case, management first sought "to build a base of what [they] believe[d] the comp would be for the existing business before layering in [those] initiatives."[93] The finance team then

---

[89] Trial Tr. 220:19–222:1 (Teffner).

[90] Trial Tr. 220:22–221:19 (Teffner) (noting that in her past experience before joining PetSmart the business units "really owned their own forecasts" but at PetSmart the management in place did not "have experience putting multiyear projections together" leaving "a small group of [senior management] to "try[] to validate with the business instead of the other way around.").

[91] Trial Tr. 219:7–22 (Teffner); JX 426; JX 430; JX 448; JX 458; JX 583.

[92] Trial Tr. 217:24–218:3 (Teffner).

[93] Trial Tr. 218:4–16 (Teffner).

"layered onto [the "base" comp projections] what it thought the value of each of the[] initiatives would be."[94]  As part of this "layering" process, the finance team sent its value assumptions to the relevant business segment leaders "to get an affirmation that yes, that looks right . . . ."[95]  And, as Teffner explained, "that's essentially what drove the top line."[96]

The Base Case forecast estimated revenues using three primary yardsticks: (1) new store openings; (2) comparable stores sales growth; and (3) four initiatives selected from the Summer Strategy.[97]  The Base Case is summarized below:[98]

| $mm | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | 5-year forecasted period | | | | |
| FYE 01/31 | 2014E Jan-15 | 2015E Jan-16 | 2016E Jan-17 | 2017E Jan-18 | 2018E Jan-19 | 2019E Jan-20 | '14E - '19E CAGR |
| Select income statement items: | | | | | | | |
| Revenue | $7,046 | $7,303 | $7,680 | $8,079 | $8,507 | $8,954 | 4.9% |
| % growth | 1.9% | 3.6% | 5.2% | 5.2% | 5.3% | 5.3% | |
| % comp | (0.2%) | 1.3% | 3.2% | 3.3% | 3.3% | 3.3% | |
| Gross margin | $2,135 | $2,219 | $2,332 | $2,444 | $2,564 | $2,687 | 4.7% |
| % margin | 30.3% | 30.4% | 30.4% | 30.2% | 30.1% | 30.0% | |
| OG&A | $1,422 | $1,469 | $1,512 | $1,558 | $1,613 | $1,669 | 3.3% |
| % sales | 20.2% | 20.1% | 19.7% | 19.3% | 19.0% | 18.6% | |
| EBITDA | $949 | $981 | $1,054 | $1,127 | $1,201 | $1,280 | 6.2% |
| % margin | 13.5% | 13.4% | 13.7% | 14.0% | 14.1% | 14.3% | |
| % growth | 2.2% | 3.4% | 7.4% | 7.0% | 6.5% | 6.6% | |
| EBITDAR | $1,287 | $1,331 | $1,422 | $1,514 | $1,608 | $1,709 | 5.8% |
| % margin | 18.3% | 18.2% | 18.5% | 18.7% | 18.9% | 19.1% | |
| EBIT | $713 | $750 | $820 | $885 | $952 | $1,017 | 7.4% |
| % margin | 10.1% | 10.3% | 10.7% | 11.0% | 11.2% | 11.4% | |
| Net income | $427 | $442 | $485 | $524 | $565 | $605 | 7.2% |
| % growth | 1.8% | 3.4% | 9.7% | 8.2% | 7.7% | 7.1% | |
| EPS | $4.33 | $4.72 | $5.45 | $6.19 | $6.99 | $7.85 | 12.6% |
| % growth | 7.7% | 9.1% | 15.4% | 13.6% | 13.0% | 12.2% | |

---

[94] Trial Tr. 218:20–22 (Teffner).

[95] Trial Tr. 220:1–18 (Teffner).

[96] Trial Tr. 218:22–23 (Teffner).

[97] JX 586 at 7; JX 598.

[98] JX 586 at 8.

The comparable store sales forecasts were ambitious and well above the performance management had projected at Summer Strategy, including comparable store sales growth.[99] Specifically, the Base Case assumed the success of each of the new revenue initiatives developed at Summer Strategy and projected comparable store sales growth of 1.3% in 2015, 3.2% in 2016 and 3.3% increases each year thereafter.[100]

The Base Case was not well received by the Board. Specifically, "when [management] reviewed the base case comp assumptions with the ad hoc committee of the board, [the committee], specifically . . . Stemberg, indicated that the comp assumptions that [management] had put in the plan were not aggressive enough and [management] needed to be far more aggressive, recognizing that potential buyers looking at [PetSmart would] discount [management's] plans themselves."[101] Accordingly, management went back to the drawing board and prepared the Base-Plus Case, which is summarized below:[102]

---

[99] Trial Tr. 233:22–234:19 (Teffner). Estimates coming out of Summer Strategy had shown that, including the acquisition of Pet360 that was under consideration but excluding any new initiatives, PetSmart's comparable store sales growth for 2015 to 2017 would range from 0.1% to 0.5%. JX 842 at 139.

[100] JX 586 at 6; JX 842.

[101] Trial Tr. 234:23–235:6 (Teffner).

[102] JX 586 at 9.

| $mm | | | 5-year forecasted period | | | | | |
|---|---|---|---|---|---|---|---|---|
| FYE 01/31 | | 2014E Jan-15 | 2015E Jan-16 | 2016E Jan-17 | 2017E Jan-18 | 2018E Jan-19 | 2019E Jan-20 | '14E - '19E CAGR |
| **Select income statement items:** | | | | | | | | |
| Revenue | | $7,046 | $7,303 | $7,702 | $8,147 | $8,615 | $9,106 | 5.3% |
| % growth | | 1.9% | 3.6% | 5.5% | 5.8% | 5.7% | 5.7% | |
| % comp | | (0.2%) | 1.3% | 3.5% | 3.9% | 3.8% | 3.8% | |
| Gross margin | | $2,135 | $2,219 | $2,341 | $2,469 | $2,599 | $2,730 | 5.0% |
| % margin | | 30.3% | 30.4% | 30.4% | 30.3% | 30.2% | 30.0% | |
| OG&A | | $1,422 | $1,469 | $1,513 | $1,561 | $1,617 | $1,675 | 3.3% |
| % sales | | 20.2% | 20.1% | 19.6% | 19.2% | 18.8% | 18.4% | |
| EBITDA | | $949 | $981 | $1,062 | $1,160 | $1,232 | $1,318 | 6.8% |
| % margin | | 13.5% | 13.4% | 13.8% | 14.1% | 14.3% | 14.5% | |
| % growth | | 2.2% | 3.4% | 8.2% | 8.3% | 7.1% | 7.0% | |
| EBITDAR | | $1,287 | $1,331 | $1,431 | $1,540 | $1,644 | $1,754 | 6.4% |
| % margin | | 18.3% | 18.2% | 18.6% | 18.9% | 19.1% | 19.3% | |
| EBIT | | $713 | $750 | $828 | $907 | $982 | $1,055 | 8.1% |
| % margin | | 10.1% | 10.3% | 10.7% | 11.1% | 11.4% | 11.6% | |
| Net income | | $427 | $442 | $489 | $538 | $584 | $628 | 8.0% |
| % growth | | 1.8% | 3.4% | 10.8% | 9.9% | 8.5% | 7.6% | |
| EPS | | $4.33 | $4.72 | $5.50 | $6.35 | $7.22 | $8.13 | 13.4% |
| % growth | | 7.7% | 9.0% | 16.5% | 15.4% | 13.7% | 12.7% | |

The Base-Plus Case "assumed more aggressive delivery of performance against the exact same initiatives that [management] had looked at in the Base Case."[103] These projections also assumed comparable store sales growth that exceeded similar projections in the Base Case.[104] The take away from the Base-Plus Case was that it depicted an even sharper turnaround of PetSmart's recent downward-trends than had been forecast previously.[105]

---

[103] Trial Tr. 235:9–14 (Teffner).

[104] *Compare* JX 586 at 8 (Base Case projections) *with id.* at 9 (Base-Plus Case projections).

[105] *See* JX 1684 (Lenhardt Dep.) 275:14–21 (describing the projections as "a hockey stick from negative to slightly positive to much more positive," meaning that "there was a lot of risk going forward to hitting these things").

As with the Base Case, management prepared the Base-Plus Case "extremely quickly."[106]  During this same time frame, PetSmart's management also prepared a third set of projections—the "Growth Case."[107]  The Growth Case started with the Base-Plus Case projections and "assumed yet even [better] performance of the exact same initiatives."[108]  Unlike the Base Case and Base Plus Case, however, the Growth Case was not prepared at the request of the Ad Hoc Committee.[109]  Rather, PetSmart management prepared the Growth Case on its own initiative because it was not "sure how far the ad hoc committee wanted [them] to go in terms of comp assumptions."[110]  Management kept the Growth Case in their "back pocket" in case the Ad Hoc Committee once again was displeased with their work on the Base Plus Case.[111]

## H. The PetSmart Board Decides to Commence a Public Sale Process

PetSmart's Board next met on August 13, 2014.[112]  At this meeting, JPM presented a preliminary valuation summary for PetSmart and reviewed several

---

[106] Trial Tr. 219:9–14 (Teffner).

[107] Trial Tr. at 236:11–16 (Teffner).

[108] Trial Tr. 236:15–16 (Teffner).

[109] *See* Trial Tr. 237:5–12 (Teffner).

[110] Trial Tr. 237:9–12 (Teffner).

[111] *Id.*

[112] PTO ¶¶ 198, 204–05.

strategic alternatives for the Company, including (1) continuing on a standalone basis while engaging in a significant leveraged recapitalization; (2) exploring a sale of the Company; and (3) exploring a strategic merger with another industry participant.[113] In connection with the third alternative, the Board focused on the potential benefits and risks associated with inviting Petco to participate in an exploratory sales process.[114] The Board identified two "overwhelming, overriding"[115] risks associated with such an overture: (1) that Petco would not be serious about acquiring PetSmart, but would feign interest in order to gain access to confidential information about PetSmart's business model, strengths and weaknesses;[116] and (2) that a Petco-PetSmart merger "would face pretty strong [antitrust] headwinds . . . [so that] approval of th[e] transaction would be quite difficult."[117] Given these concerns, the Board "was not very keen on engaging with Petco" at that time.[118]

---

[113] PTO ¶ 206.

[114] Trial Tr. 414:12–416:24 (Gangwal).

[115] Trial Tr. 415:14 (Gangwal).

[116] Trial Tr. 415:9–10 (Gangwal).

[117] Trial Tr. 415:15–17, 414:21–23 (Gangwal).

[118] Trial Tr. 415:17–18 (Gangwal).

During the August 2014 meeting, PetSmart management and JPM provided the Board with an overview of management's standalone plan and the Base Case and Base-Plus Case financial projections.[119] The Board admonished management that that Base Case and the Base-Plus Case were not aggressive enough because PetSmart "needed to put [its] best foot forward in terms of the projections [it was] putting forward to . . . potential buyers."[120] Teffner's "take-away from the [August 2014 Meeting] was very much one that [management] needed to put [their] best foot forward because potential buyers were going to discount [management's] assumptions and assume that [the Company was] putting more aggressive assumptions forward."[121]

At the conclusion of the August meeting, the Board determined that it would publicly announce that PetSmart was exploring strategic alternatives including a possible sale of the Company.[122] Accordingly, on August 19, 2014, PetSmart issued a press release to that effect, announcing that, based on a thorough, year-long business review, the Board had determined to explore strategic alternatives for the

---

[119] Trial Tr. 237:17–238:13 (Teffner). Management did not present the Growth Case at the August 2014 Meeting. *See* Trial Tr. 237:5–12 (Teffner).

[120] Trial Tr. 241:10–13 (Teffner).

[121] Trial Tr. 242:22–243:2 (Teffner).

[122] Trial Tr. 418:12–419:8 (Gangwal).

Company to maximize value for shareholders, including a possible sale of the Company.[123]

Also on August 19, 2014, PetSmart issued a second press release announcing PetSmart's Q2 2014 results.[124] Here, PetSmart announced that its comparable store sales for Q2 2014 had declined to -0.5%, with comparable transactions declining to 2.6%.[125] This press release also announced that the Company had entered into a definitive merger agreement to acquire online retailer Pet360 for $130 million and that the Company would be launching a broad cost reduction program and certain other growth initiatives.[126]

## I. PetSmart Management Formulates the Profit Improvement Plan and Finalizes its Projections

Prior to the August 13, 2014 Board meeting, PetSmart had engaged two consulting firms to analyze certain aspects of PetSmart's business and identify cost-savings opportunities.[127] In May 2014, PetSmart engaged The Hackett Group to identify cost cutting initiatives with respect to PetSmart's Selling, General, and

---

[123] PTO ¶ 213.

[124] PTO ¶ 211.

[125] *Id.*

[126] PTO ¶ 212. The PetSmart-Pet360 merger closed on September 29, 2014, with a purchase price of $131.5 million and a potential earnout of $30 million. PTO ¶ 221.

[127] *See* PTO ¶¶ 366–70, 378; Trial Tr. 247:22–248:23 (Teffner).

Administrative expenses (specifically, a headcount reduction).[128]  And in May/June 2014, PetSmart engaged A.T. Kearny, Inc. to focus on cost cutting initiatives with respect to certain of PetSmart's indirect expenses.[129]

Shortly after the August 2014 Board meeting, with the assistance of its consultants, PetSmart's management undertook to formulate a large-scale cost-savings plan at the Board's direction.[130]  This plan came to be known as the "Profit Improvement Plan" (or "PIP").[131]  The PIP consisted of: (1) implementing a headcount reduction;[132] (2) engaging A.T. Kearny to develop a cost-savings plan with respect to PetSmart's cost of goods sold ("COGS") expenses and certain of PetSmart's other indirect expenses such as spending on transportation, marketing, supplies, real estate, packaging, and real estate services;[133] and (3) engaging the Peppers & Rogers Group to develop a cost-savings plan with respect to PetSmart's enterprise costs.[134]  Two weeks after the August 2014 Board meeting, Teffner sent

---

[128] PTO ¶ 378; Trial Tr. 247:22–24 (Teffner).

[129] Trial Tr. 248:5–7 (Teffner); PTO ¶ 370.  PetSmart had previously entered into a Master Provider Agreement with A.T. Kearney in August 2013.  *Id.*

[130] Trial Tr. 247:14–19 (Teffner); *see* PTO ¶ 366.

[131] Trial Tr. 247:14–19 (Teffner); PTO ¶ 366.

[132] Trial Tr. 248:14–17 (Teffner).

[133] Trial Tr. 248:17–23 (Teffner); PTO ¶¶ 371–73.

[134] PTO ¶ 375; Trial Tr. 248:24–249:7 (Teffner) ("We also brought in Peppers & Rogers[,] and their work was [focused] around a Lean Six Sigma operational efficiency process, . . .

an email to the Board stating that management's target for PIP cost savings was "[approximately] $160M–$200M+ EBITDA improvement."[135] The final PIP savings developed by the consultants, together with management, and presented to the Board showed an expected range of $183–$283 million in EBITDA savings annually.[136]

While management worked on developing the PIP, they also worked to prepare an updated set of financial projections that would integrate the PIP savings.[137] Specifically, between August and October 2014, PetSmart management prepared what would be their final revised set of financial projections for presentation to the Board (the "Management Projections").[138] The Management Projections started with the Base-Plus Case projections and layered on (1) greater sales growth assumptions for the same proposed business initiatives, (2) new sales growth expected from the Pet360 acquisition, and (3) cost savings associated with

---

to see if [PetSmart] had opportunity to reduce labor costs by operating more efficiently than [it was] currently operating at the time."). PetSmart engaged Peppers & Rogers to perform this work on September 12, 2014. PTO ¶ 375.

[135] JX 668 at 1.

[136] JX 2021 at 375; Trial Tr. 338:22–339:1 (Teffner); PTO ¶ 232.

[137] See Trial Tr. 247:22–249:8 (Teffner); PTO ¶¶ 223, 231.

[138] PTO ¶¶ 223, 231.

the PIP.[139]  The forecasts for comparable store sales growth were significantly higher than those set forth in both the Base and Base-Plus Cases.  These new projections also included more aggressive Net Sales, EBITDA, Earnings Per Share and Capex numbers.[140]  They estimated that, through the PIP, PetSmart would achieve cost savings totaling $120 million in 2015 and then $200 million for each of the subsequent years laid out in the forecast.[141]  The Management Projections are summarized below:[142]

| Management Projections (FY2014-2019) | | | | | | |
|---|---|---|---|---|---|---|
| ($ in millions) | 2014E Jan-15 | 2015E Jan-16 | 2016E Jan-17 | 2017E Jan-18 | 2018E Jan-19 | 2019E Jan-20 |
| Revenue | $7,088 | $7,456 | $7,869 | $8,331 | $8,822 | $9,329 |
| EBITDA | $958 | $1,060 | $1,223 | $1,326 | $1,422 | $1,515 |
| Net Income | $432 | $490 | $588 | $646 | $700 | $748 |
| Capital Expenditure | $152 | $150 | $157 | $167 | $176 | $187 |
| FCF Before Distributions | $465 | $571 | $667 | $684 | $736 | $786 |

[139] PTO ¶ 223; Trial Tr. 254:16–255:6, 259:1–14 (Teffner).

[140] *Compare* JX 807 at PETS_APP00000694 *with* JX 586 at PETS_APP00000438–39.

[141] JX 1136 at 8; Trial Tr. 339:7–10 (Teffner).

[142] PTO ¶ 231.

Once again, management designed its latest projections to be aggressive—"bordering on being too aggressive."[143]  Indeed, Vance went so far as to characterize the Management Projections as approaching "insan[ity]."[144]  With that said, these projections reflected an inexperienced management team's best effort at estimating how PetSmart would perform in the future if all of its performance and cost initiatives paid off.[145]  And management made a point of "being very clear with respect to the assumptions that they were making."[146]

The record is clear that the Board exerted substantial pressure upon management to prepare increasingly more aggressive and ultimately unrealistic long-term projections.  In this regard, Lenhardt and Teffner were told that their jobs "depended" on it.[147]  And management heard the Board "loud and clear."[148]  For its part, JPM told PetSmart management that prospective buyers would likely view the

---

[143] Trial Tr. 258:13–14, 258:18–20 (Teffner).

[144] JX 758.

[145] Trial Tr. 368:19–369:16 (Teffner).  *See also* JX 1674 (Vance Dep.) 136:25–137:3.

[146] *Id.*

[147] JX 671 at PETS_APP00215455.  *See also* JX 608; JX 668.

[148] JX 673.

overly aggressive Management Projections skeptically,[149] and that management best be prepared to defend them when the sales process got underway.[150]

## J. The Auction for PetSmart

While PetSmart management continued the back-and-forth with the Board over its projections, JPM opened the auction process for PetSmart in earnest. JPM spoke with 27 potential bidders following the announcement that PetSmart was exploring a sale in August through early October.[151] As among the potential bidders, three were potential strategic partners that had been targeted by JPM and the Board—Wal-Mart, Target, and Tractor Supply—and the rest were financial sponsors.[152] Ultimately, none of the strategics elected to participate in the process.[153] Of the 24 private equity funds with whom JPM spoke, 15 signed nondisclosure agreements and moved forward with the bidding process.[154]

---

[149] Trial Tr. 256:11–13, 257:10–11 (Teffner).

[150] JX 758; JX 753.

[151] JX 1336 at 23; Trial Tr. 884:10–885:4, 886:10–18 (Aiyengar).

[152] Trial Tr. 919:4–921:21 (Aiyengar).

[153] *Id.*

[154] JX 1336 at 23; JX 811 at PETS_APP00000578; Trial Tr. 887:18–888:5 (Aiyengar).

The Board held additional meetings with JPM on October 2 and 3, 2014, to discuss, among other things, the risks and benefits of formally inviting Petco to bid for the Company.[155] Citing the risks it and JPM had previously identified, the Board again decided that it was not in the Company's best interests to pursue a transaction with Petco.[156] Of course, the Board was open to engaging with Petco if Petco expressed a serious indication of interest.[157]

During the Board meetings on October 2 and 3, PetSmart's management updated the Board on their progress with the PIP, including their expectation that the Company would achieve cost savings of $120 million in 2015 and $200 million in 2016.[158] Management also presented the Management Projections to the Board.[159] JPM's reaction to this presentation was to reiterate that buyers would likely be skeptical of PetSmart's ability to achieve those results as potential bidders had expressed concerns to JPM that well-documented trends in PetSmart's performance did not bode well for the future.[160] Even so, the Board decided to use the

---

[155] JX 803; JX 811.

[156] JX 803 at PETS_APP00000557–58.

[157] *See* Trial Tr. 417:13–418:1 (Gangwal); Trial Tr. 923:1–16 (Aiyengar).

[158] JX 805 at PETS_APP00000609.

[159] *Id.*

[160] JX 803 at PETS_APP00000556.

Management Projections for the auction process,[161] with the expectation that bidders would give a "haircut" to the projections in any event.[162]

PetSmart's electronic data room was opened to bidders after the October 3 Board meeting. It was well-stocked with comprehensive, nonpublic information about PetSmart, including information about PetSmart's financials, performance and the PIP.[163] PetSmart's management also made presentations to the various potential bidders who had signed nondisclosure agreements.[164] Around this time, JPM informed potential bidders that Longview would consider rolling over up to 7.5 million of its approximately 9 million shares in a sale of the Company.[165]

PetSmart received five preliminary bids by October 31, 2014: (1) $80–$85 per share from Clayton, Dubilier & Rice ("CD&R"); (2) $81–$84 per share from Apollo Global Management L.P. ("Apollo"); (3) $81–$83 per share from BC Partners; (4) $70–$75 per share from KKR & Co. L.P. ("KKR"); and (5) $65 per share from

---

[161] *See* PTO ¶¶ 315–17.

[162] *See* Trial Tr. 234:23–235:8, 242:22–243:2, 256:11–17, 258:8–14 (Teffner); Trial Tr. 421:4–422:3 (Gangwal); Trial Tr. 892:1–20 (Aiyengar).

[163] Trial Tr. 263:3–265:13 (Teffner); JX 811 at PETS_APP00000580; JX 913 at PETS_APP00000748; JX 1054 at PETS_APP00000907.

[164] JX 913 at PETS_APP00000747; Trial Tr. 262:1–263:2 (Teffner).

[165] JX 861.

Ares Management, L.P. and Canada Pension Plan Investment Board.[166] The stock price as of October 31 was $72.35, while the unaffected price, which JPM set as of July 2, 2014, was $59.81.[167] Some members of the Board were "surprised that the numbers had come in that high."[168]

As the auction progressed, the Board continued to consider alternatives to a sale.[169] In this regard, the Board pressed management to create a stronger standalone plan for the Company.[170] And the Ad Hoc Committee asked JPM to report on the financing that would be available for a leveraged recapitalization of the Company should the Board decide against a sale.[171]

The Board next reviewed the progress of the auction for PetSmart with its advisors at a meeting on November 3.[172] JPM reported on the initial indications of interest it had received as well as feedback from parties who chose not bid. This feedback largely reflected a view that PetSmart's business had "significant execution

---

[166] JX 913 at PETS_APP00000749.

[167] *Id.*

[168] Trial Tr. 430:3–4 (Gangwal).

[169] *See* JX 666; JX 915; Trial Tr. 427:22–428:15 (Gangwal).

[170] JX 666.

[171] JX 915 at PETS_APP00000741–42.

[172] JX 913.

36

risk" and that there was inadequate potential for upside growth.[173]   The Board decided to allow the four bidders who bid $80 per share or higher (CD&R, Apollo, BC Partners and KKR) to continue in the process.[174]   These remaining bidders performed further due diligence, which included access to more detailed information about PetSmart's financials, the Management Projections and the PIP, and additional meetings with management.[175]

PetSmart released its Q3 results on November 18, 2014.[176]  Comparable store sales growth was stagnant and comparable transactions were down 2.4%.[177] PetSmart also announced its progress on the PIP and its expectation that the plan would be fully implemented by the end of fiscal year 2015, and reiterated its expectation that the plan would result in a pre-tax cost savings of $120 million in 2015 and $200 million per year starting in 2016.[178]

---

[173] JX 913 at PETS_APP00000752; Trial Tr. 898:11–899:11 (Aiyengar).

[174] JX 1336 at 24.  The Board later determined to allow CD&R and KKR to work together based on the understanding that this would allow them to make a stronger bid.  *Id.*; JX 953.

[175] JX 1054 at PETS_APP0000903.

[176] JX 984.

[177] *Id.*

[178] *Id.*

The Board met again on December 2 and 3 to consider whether to sell the Company, remain independent or pursue a leveraged recapitalization.[179] The Board also reexamined the Management Projections, noting that it believed the PIP savings were achievable but that it was skeptical about the Company's ability to achieve the projected top-line revenue and comparable store sales growth.[180] The feedback delivered to management was that the Board had a low level of confidence in PetSmart's ability to achieve the results forecasted in the Management Projections.[181]

The Board's skepticism centered largely around the projections of comparable stores sales growth; "many in the board really did not believe" that these projections were realistic.[182] To understand PetSmart's standalone value better, the Board determined that it needed to "see additional sensitivity analyses, particularly around top-line and same-store sales growth."[183] Accordingly, the Board directed JPM to prepare sensitivities assuming a 2% comparable store sales growth.[184] The requested

[179] JX 1336 at 24; JX 1121; JX 1081 at PETS_APP00000759–61.

[180] JX 1081 at PETS_APP00000760.

[181] Trial Tr. 440:7–9 (Gangwal). *See also* Trial Tr. 432:13–433:14, 434:1–8, 436:13–19, 440:2–4 (Gangwal).

[182] Trial Tr. 433:9–14 (Gangwal). *See also* Trial Tr. 433:12–13, 434:3, 436:14 (Gangwal).

[183] JX 1081 at PETS_APP00000760.

[184] Trial Tr. 434:4–8 (Gangwal); Trial Tr. 910:24–911:8 (Aiyengar). I will hereafter refer to these adjustments to the Management Projections as the "JPM sensitivities." This should

sensitivities were set at 2% because the Board had "a great amount of discomfort . . . [about whether the 4% comparable store sales used in the Management Projections] would be achievable, attainable or not."[185]  Instead, the Board believed that "2 percent looked more reasonable, and something that the management team more than likely should be able to get to, if they executed a plan."[186]

In the weeks leading up to the final bids, questions arose about whether the financial sponsors would be able to obtain deal financing based on reports that the Office of the Comptroller of the Currency ("OCC") and Federal Reserve would engage in "increased scrutiny . . . over LBO loans."[187]  The OCC and Federal Reserve had implemented restrictions on the amount of leverage that would be allowed in deal financing and, in the days leading up to Thanksgiving 2014 (in the

---

not be interpreted, however, as a finding that the JPM sensitivities were undertaken on JPM's own initiative.  As noted above, I am satisfied that the Board came up with the idea of the 2% sensitivities and then directed its financial advisor to run the analysis.  The JPM sensitivities began with the Management Projections and then: (1) for Sensitivity #1 applied a higher discount rate; (2) for Sensitivity #2 made no changes to the new store assumptions through FY19 but eliminated new stores thereafter; (3) for Sensitivity #3 assumed half the new stores through FY19 and eliminated new stores thereafter; and (4) for Sensitivity #4 assumed no new stores after FY14.  *See* JX 1336 at 35.  Sensitivity #1 was the only sensitivity not to make adjustments based on 2% comparable store sales growth. *Id.*  This sensitivity was not featured at trial, not addressed by the experts and will not be included herein when referencing the JPM sensitivities.

[185] Trial Tr. 436:14–19 (Gangwal).

[186] *Id.*

[187] JX 2044.  *See also* JX 1414; JX 1618.

midst of the PetSmart auction), regulators indicated they would begin to enforce these regulations more strictly than before.[188] This led bidders to perceive that the quantum of debt available to finance an acquisition of PetSmart had tightened.[189] While there were initial concerns that this increased regulatory scrutiny may affect the bids for PetSmart, the evidence reveals that those concerns abated after Thanksgiving when it became clear that all of the bidders would have no difficulty securing debt financing at the levels necessary to fund their bids for PetSmart at the values they deemed appropriate.[190]

---

[188] JX 1414 at 3; JX 2044.

[189] *See* Trial Tr. 859:15–860:24 (Svider); JX 1104; JX 1084 (Svider characterizing the financing restrictions as "[w]orse than during Lehman in some ways"). *See also* JX 1103; JX 1109 at 5–6 (discussing BC Partners' issues with debt financing); Trial Tr. 995:4–6 (Aiyengar) (discussing Apollo's struggles to get its debt financing in order); JX 1296 at 182 (stating that KKR's financing for the PetSmart deal had "apparently" collapsed).

[190] *See* Trial Tr. 861:18–862:3 (Svider) (testifying that BC Partners was able to get all the financing that it needed); Trial Tr. 916:16–918:3, 994:13–995:6 (Aiyengar) (testifying that all other bidders were able to secure deal financing and that none were prevented from reaching the levels needed to bid their desired price). The ability of the bidders to secure adequate financing in spite of the enhanced regulation appears to be attributable, at least in part, to PetSmart's strong cash flow profile. *See* JX 1109 at BC00146204 (noting that BC Partners was able to get seven "viable" financing proposals notwithstanding the increased regulatory scrutiny due to the "high quality of the credit" of PetSmart); Trial Tr. 917:7–918:10 (Aiyengar) (testifying that she had no reason to believe that any regulation of the U.S. debt market negatively impacted the bidding for PetSmart, likely because of PetSmart's "pretty strong cash flow profile," as she saw U.S. regulated banks participating in diligence calls, whereas U.S. regulated banks typically will not participate in financing when leverage levels are too high).

On December 10, PetSmart received new offers from the remaining bidders.[191] BC Partners made a binding offer of $80.70 per share.[192] Apollo made a binding offer of $80.35 per share.[193] KKR and CD&R, working together, verbally indicated they would not offer more than PetSmart's current stock price, which was approximately $78 per share.[194] When JPM presented these offers to the Ad Hoc Committee, the committee directed JPM to engage further with Apollo and BC Partners to see if they would increase their bids.[195] The Ad Hoc Committee also decided on December 12 that it would allow Longview to join with BC Partners after BC Partners "indicated that they may be able to offer [] a higher price with Longview."[196]

JPM returned to the bidders and directed them to submit their best and final offers because the Board would soon be meeting to make a final decision whether to sell the Company or go in a different direction. Specifically, JPM told bidders "if

[191] JX 1336 at 25.

[192] JX 1144.

[193] JX 1134.

[194] JX 1336 at 25.

[195] *Id.*

[196] JX 1142 at 1. *See also* PTO ¶¶ 288–89. Apollo had indicated that it was not interested in partnering with Longview and that its price would be the same with or without Longview's participation. JX 1142 at 1; JX 1153 at PETS_APP00000944.

[they] had anything more in [their] pocket, now [was] the time to put it [in]."[197]

Apollo responded with an offer of $81.50 per share; BC Partners, with its commitment from Longview in hand, offered $82.50 per share.[198] With some prodding, JPM was able to get BC Partners to increase its offer to $83 per share.[199] Both parties made clear that these were their best and final offers.[200]

### K. The Auction Concludes and the Board Recommends the BC Partners Offer to Shareholders

The PetSmart Board met on December 13 to discuss the final offers from BC Partners and Apollo and to consider strategic alternatives to a sale of the Company.[201] JPM made presentations to the Board on each of these alternatives, including the possibility that the Board may have to engage in a proxy contest with JANA.[202] JPM also presented its valuation analysis under various scenarios including a standalone valuation of PetSmart if the Board determined to terminate

---

[197] Trial Tr. 907:5–12 (Aiyengar).

[198] JX 1336 at 26.

[199] *Id.*

[200] JX 1153 at PETS_APP00000945; Trial Tr. 906:7–908:9 (Aiyengar).

[201] JX 1156; JX 1157; JX 1153 at PETS_APP00000944–45. In fact, the night before this meeting, PetSmart management worked to put together a press release that would announce that the Company had decided to end the sales process. JX 1138.

[202] JX 1149; JX 1153; JX 1155; JX 1158.

the auction.[203] This standalone valuation focused on a DCF analysis based on the Management Projections that resulted in a valuation for the Company of $78.25–$106.25 per share.[204] Understanding that the Board had little faith in the Management Projections, JPM also presented the Board with the results of the sensitivity analyses the Board had requested which resulted in a valuation range of $65–$95.25 per share.[205]

As a part of its presentation, JPM delivered its fairness opinion with respect to the BC Partners offer concluding that, as of that date, the Merger Price of $83 per share in cash was fair from a financial point of view to the stockholders of the Company.[206] Petitioners point to several aspects of JPM's fairness opinion they contend reveal that JPM "manipulated [its] financial analysis" in order to get to a place where it could recommend the BC Partners proposal.[207] At the core of the criticism is the contention that JPM "stretched" to reach a high weighted average cost of capital ("WACC") for PetSmart in order to deflate the DCF results.[208] In this

---

[203] JX 1158 at PETS_APP00001265–73; JX 1156 at PETS_APP00001129–31.

[204] *Id.*

[205] JX 1158 at PETS_APP00001265–68; Trial Tr. 432:13–436:19 (Gangwal); Trial Tr. 908:14–912:20 (Aiyengar).

[206] JX 1153 at PETS_APP000945; PTO ¶ 293.

[207] Pet'rs' Post-Trial Br. 72.

[208] *Id.* at 73.

regard, Petitioners select certain of JPM's internal communications they contend demonstrate that Aiyengar pushed her team to inflate PetSmart's WACC into double digits even though her team had determined that a much lower WACC was appropriate.[209]

To be sure, there were discussions among the JPM deal team regarding whether a double digit WACC could be defended.[210] But the evidence also demonstrates that JPM approached its work without preconceptions or designs to reach a desired result.[211] JPM made no secret of its approach to calculating WACC and walked the Board through that analysis in detail.[212] Petitioners may not agree

---

[209] *Id.*

[210] JX 847.

[211] *See* JX 1680 (Gold Dep.) 47:24–48:2, 49:7–50:11; JX 1679 (Aiyengar Dep. Day 1) 327:16–330:6. I note that Aiyengar's deposition testimony, proffered by Respondents, along with the deposition testimony of other witnesses who testified at trial on Respondent's behalf, is admissible over Petitioners' objection under either Court of Chancery Rule 32(a)(4) or DRE 106. Court of Chancery Rule 32(a)(4) provides that "[i]f only part of a deposition is offered in evidence by a party, an adverse party may require the offeror to introduce any other part which ought in fairness to be considered with the part introduced, and any party may introduce any other parts." Delaware Rule of Evidence 106 provides that where a party introduces "a writing or recorded statement or part thereof . . . , an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." After an analysis of the deposition testimony proffered by the Respondents in response to Petitioners' Post-Trial Brief, I find that each instance where Respondent cites to the deposition testimony of Teffner, Svider, Aiyengar and Weinstein fits under the "completeness" doctrine codified in Court of Chancery Rule 32(a)(3)(B) and DRE 106, and is therefore admissible.

[212] JX 1086 at JPM00000203; JX 1158 at PETS_APP00001282.

with that approach but there is simply no credible evidence that JPM set out to manipulate its analysis to support a fairness opinion.[213]

Petitioners also criticize JPM for utilizing the so-called "Barra beta," which Petitioners (and others) describe as a "'black box' form of forward-looking beta" that is difficult, if not impossible, to verify.[214] Contrary to Petitioners' characterization of JPM's process, however, the evidence reveals that, in addition to considering Barra's forward-looking beta, JPM considered "Barra predicted, Barra historical, as well as relevered beta."[215]

Petitioners next criticize JPM for "artificially inflat[ing]" the betas it applied by "arbitrarily" selecting PetSmart's peer group and then selecting the betas of companies in the lowest quartile of that group even though PetSmart had historically

---

[213] JX 605; JX 1086; JX 1158.

[214] JX 1679 (Aiyengar Dep. Day 1) 253:5–8; JX 79. "Barra is a company owned by MSCI, Inc., that provides investment decision-making tools, including market indices and a beta service." *In re Appraisal of DFC Global Corp.*, 2016 WL 3753123, at *8 n.89 (Del. Ch. July 8, 2016). *See* JX 1698 (Dages-Opening) 40–42 ("Barra betas are rarely used by academics to justify their beta estimates. I am unaware of any academic evidence that Barra beta estimates are superior predictors of a stock's future beta than are historical estimates such as Bloomberg. Another problem with Barra betas is that they cannot be unlevered and relevered to reflect the appropriate target capital structure. Therefore, a peer-based beta derived from Barra betas can potentially reflect the risk of a capital structure that is different than the operative capital structure of the company being valued. . . . In addition, a commonly referenced valuation textbook cautions the use of Barra betas because they are not replicable. I understand that, for those same reasons, Barra betas have yet to be accepted by the Delaware Chancery Court.") (citations omitted).

[215] *See* JX 1158 (JPM's slide deck reflecting its WACC analysis relied upon Barra predicted and historical betas); Trial Tr. 947:23–948:1 (Aiyengar).

traded at a premium to its peers.[216] Here again, Petitioners' criticism recounts only a portion of the evidence. First, the criticism glosses over the fact that PetSmart was a niche retailer with only one true peer (Petco). Moreover, the complete evidentiary picture reveals that, after conducting a "very detailed benchmarking analysis," JPM looked to the betas of companies that had "operating and financial statistics" that it could meaningfully correlate with PetSmart's operations, "numbers and projections."[217]

While one can debate the results JPM reached, and can speculate whether JPM would have arrived at the same place had it utilized different inputs in its valuation analysis,[218] there is no credible basis to debate whether JPM skewed its analysis to push the Board to accept the BC Partners offer. The JPM analysis was thorough and the results were objectively rendered.[219]

---

[216] Pet'rs' Post-Trial Br. 72.

[217] JX 1682 (Aiyengar Dep. Day 2) at 412:9–413:15. *See also* JX 1682 (Aiyengar Dep. Day 2) at 122:15–24, 243:8–245:1, 288:7–24, 320:3–10, 341:21–342:21, 673:24–675:10; JX 534; JX 538.

[218] Trial Tr. 958:21–959:10 (Aiyengar) (agreeing that had JPM utilized a lower WACC it could not have rendered its fairness opinion).

[219] I also find no basis to accept Petitioners' contention that JPM labored under disabling conflicts. Pet'rs' Post-Trial Br. 74. JPM's previous work with Petco was disclosed to the PetSmart Board and, if anything, it was deemed as a benefit not a conflict. Trial Tr. 203:21–204:6 (Teffner). JPM's prior relationships with potential private equity buyers, including those that actively participated in the process, was correctly deemed by the Board to be a "fact of business life." *See In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 582 (Del. Ch. 2010) (noting that it is "one of the facts of business life that most of the top, if not all, banks have relationships with the major private equity firms."); Trial Tr. 484:22–

Aiyengar shared her view during the December 13 Board meeting that the PetSmart auction had been "a robust auction process, where anybody who had an interest in this company had the opportunity to engage with the company and see whether they wanted to buy the company."[220] The Board then weighed the $83 per share offered by BC Partners generated by this process against the Company's prospects if it remained standalone.[221] In its deliberations, the Board considered the aggressiveness of the Management Projections, which it felt were heavily dependent on a number of factors breaking the Company's way all of which were subject to much speculation and volatility.[222] After weighing all options, the Board decided to take the $83 per share offered by BC Partners, as this was a "certainty," rather than confront the "risk of trying to get something more than $83 if [PetSmart] were a

23 (Gangwal) (testifying that he "knew that [JPM] would have many, many" relationships with private equity firms). Nor is there a basis in the evidence to find that JPM misled the Board regarding potential conflicts. *See* Pet'rs' Post-Trial Br. 75. The evidence to which Petitioners refer in support of this contention, JX 1251, upon careful reading, says no such thing.

[220] Trial Tr. 925:12–15.

[221] *See* JX 1336 at 27; Trial Tr. 439:4–441:9 (Gangwal).

[222] JX 1336 at 27 (In considering the achievability of the Management Projections, the Board considered, *inter alia*, "the risks associated with executing on [PetSmart's] business plans, including that [PetSmart's] business plans and Profit Improvement Plan [were] based, in part, on projections . . . dependent on a number of variables, including economic growth, same-store-sales growth, ability to execute on store expansion plans, and overall business performance that are difficult to project and are subject to a high level of uncertainty and volatility.").

stand-alone."[223]  This decision reflected the Board's pessimism that management would be able to deliver on their plans and its view that such efforts likely would not yield more than the $83 per share that had been achieved through the sales process.[224] The Board unanimously voted to approve and recommend the Merger with BC Partners at the conclusion of the December 13 meeting.[225]  It announced the transaction and signed the Merger Agreement the following day.[226]

The $83 per share was $1.50 higher than what the next highest bidder, Apollo, had offered.  Indeed, Apollo told JPM after the process concluded that it "never would have paid that price" for PetSmart.[227]  Several financial analysts also were surprised and impressed by the price achieved in the auction.[228]  While PetSmart was covered by more than a dozen securities analysts, the consensus price target for

---

[223] Trial Tr. 440:23–441:2 (Gangwal).  *See also* JX 1336 at 26–27 (proxy statement summarizing the Board's reasons for recommending the merger to stockholders).

[224] Trial Tr. 439:16–441:9 (Gangwal).

[225] JX 1336 at 26.

[226] *Id.*

[227] Trial Tr. 908:9 (Aiyengar).  I have considered this hearsay testimony only as evidence of the state of mind of the declarants, not for the truth of the matter asserted.  DRE 803(3).

[228] JX 1188; JX 1187; JX 1185.  In addition to DRE 803(3), these analyst reports are admissible under DRE 703 as they were relied upon by Professor Metrick in formulating his opinion and are "of a type" of information "reasonably relied upon by experts" in the valuation field.  They have "help[ed] the [Court] understand [the] expert's thought process and determine what weight to give [the] expert's opinion." *Towerview LLC v. Cox Radio, Inc.*, 2013 WL 3316186, at *2 (Del. Ch. June 28, 2013) (applying DRE 703).

PetSmart in the year preceding the Merger, even after the PIP was disclosed, never exceeded $75 per share.[229]

PetSmart's definitive proxy statement, filed with the SEC on February 2, 2015 (the "Proxy"), disclosed the Management Projections as well as the JPM sensitivities.[230] When introducing the projections, the Proxy disclosed that the Company had not historically prepared long-term projections in the ordinary course of its business and that it was "wary" of doing so.[231] The Board wanted stockholders to have the Management Projections because they had been utilized by the Board, JPM, and the bidders.[232] But the Proxy made clear that the Board was cautioning stockholders not to place undue reliance on the projections.[233] With regard to the JPM sensitivities, the Proxy disclosed that these had been prepared by JPM "to assist

---

[229] *See* JX 1703 (Metrick-Rebuttal) at 71. *See also* JX 1697 (Metrick-Opening) at Ex. 8 (providing monthly summary of analyst price targets for PetSmart stock from January 2012 to March 2015).

[230] JX 1336 at 35–36, 38–39.

[231] *Id.* at 37–38.

[232] *Id.* The Proxy "included a summary of [the Management Projections] . . . to give stockholders access to certain nonpublic information provided to [the PetSmart Board] and J.P. Morgan for purposes of considering and evaluating the Company's strategic and financial alternatives, including the merger." *Id.*

[233] *Id.* at 38 ("Readers . . . are cautioned not to place undue reliance on the [projections found in the Proxy]."). *See also* Trial Tr. 324:7–15 (Teffner) ("The proxy had disclaimer statements in there with respect to projections . . . to explain that these are projections" and therefore speculative.).

the board in assessing the potential downside risks that could arise from reasonable deviations in the assumptions underlying the [Management] Projections."[234]

After the announcement of the transaction, and the disclosure of the Management Projections in the Proxy, no topping bids emerged and no further inquiries about PetSmart surfaced before the Merger closed.[235] The stockholder vote on March 6, 2015, overwhelmingly favored the Merger; 99.3% of voting shares of PetSmart voted in favor of the transaction, representing 77.4% of the 99,455,151 outstanding common shares.[236] The Merger closed on March 11, 2015.[237]

## L. BC Partners Creates its Plan for PetSmart

As one would expect, BC Partners formulated a plan to turnaround PetSmart throughout the auction process so it could hit the ground running should it win the bid. It engaged Michael Massey, the former CEO of Collective Brands, former President of Payless, Inc. and current director of Office Depot, to provide counsel as it pursued its goal (as reported to investors) of making a significant retail

---

[234] JX 1336 at 39.

[235] *See* Trial Tr. 926:5–7 (Aiyengar) ("[T]here was nobody who called after the deal was announced really, other than to say congratulations for getting such a good price.").

[236] PTO ¶¶ 3–4; JX 1496.

[237] PTO ¶ 5.

acquisition.[238] When looking at PetSmart, Massey believed the Company lacked a clear strategy or understanding of its customers, meaning it was ripe for a turnaround.[239] BC Partners also believed that PetSmart had been "undermanaged," but that these management problems had been masked historically by "the strength of underlying market growth" in the pet specialty industry.[240] BC Partners' strategic hypothesis was that PetSmart's performance slowed when the underlying growth trends in the pet specialty industry slowed. It posited that PetSmart could be revived with a new management team, headed by Massey, who would implement a series of new revenue and cost initiatives.[241]

In performing its due diligence, BC Partners engaged Boston Consulting Group to speak to PetSmart's vendors on its behalf.[242] It also spoke directly to several former PetSmart executives and consultants.[243] With this information in hand, BC Partners was confident that the Management Projections were not

---

[238] *See* JX 779; JX 931.

[239] JX 779; Trial Tr. 1011:6–23 (Massey).

[240] JX 1060 at BC00105547.

[241] JX 1060 at BC00105547–49, 560, 617–21; Trial Tr. 739:9–742:1 (Svider).

[242] Trial. Tr. 833:15–838:16 (Svider).

[243] Trial Tr. 827:4–833:4, 838:21–841:2 (Svider).

achievable, at least not with PetSmart's current management in place.[244]  Therefore, when evaluating PetSmart, BC Partners developed its own "BCP Case."[245]  The BCP Case projected lower total revenues, year-over-year total sales growth and fewer new store openings from 2014 to 2019.[246]  These projections were included in the equity syndication memo that BC Partners sent to potential investors.[247]  BC Partners told its potential investors that its case was conservative, with room for significant upside.[248]

Massey also created his own set of projections based on his plans for running PetSmart (the "Massey Case"), which included the implementation of his proposed cost and revenue initiatives which he hoped would help drive up EBITDA.[249] Massey told BC Partners' equity investors that these projections were conservative and that he was very confident they could be achieved.[250]  The projected cash flows

---

[244] Trial Tr. 746:9–15 (Svider).

[245] *Id.*

[246] *Compare* JX 1060 at BC0010552 *with* JX 807 at PETS_APP00000692–94.

[247] JX 1065 at 80.

[248] JX 1065 at 83.

[249] JX 1060 at BC00105546; JX 1132; Trial Tr. 739:9–740:11 (Svider).

[250] JX 1238 at 29, 48; Trial Tr. 1125:8–1127:23 (Massey).

from the Massey Case were higher than those in the Management Projections by $192 million.[251]

BC Partners also prepared the "Bank Case" with the help of PetSmart's management after the signing of the Merger Agreement[252] in order to solicit debt financing for the transaction[253] and present to ratings agencies so they could rate the bonds BC Partners would issue in connection with the transaction.[254] The Bank Case was designed to be conservative; it assumed, for instance, that PetSmart would have no new store openings in later years.[255]

## M. PetSmart's Performance in the Period Leading Up To The Stockholder Vote and Post-Closing

Beginning in December of 2014, preliminary estimates suggested that PetSmart was outperforming the forecasts in the Management Projections for items such as comparable store sales, comparable transactions and earnings per share.[256]

---

[251] Trial Tr. 526:14–19 (Dages).

[252] PTO ¶ 309; Trial Tr. 360:22–361:15 (Teffner).

[253] PTO ¶ 311; Trial Tr. 362:9–16 (Teffner).

[254] PTO ¶ 309; Trial Tr. 363:17–20 (Teffner). "Bank Case" is a term of art in the LBO industry to describe projections meant to reflect a company's post-acquisition capacity to service its debt. They are heavy on cash flows and light on growth. Trial Tr. 692:3–15 (Dages).

[255] Trial Tr. 639:2–8 (Dages); Trial Tr. 373:14–18 (Teffner).

[256] JX 1280; JX 1411 at 17.

When PetSmart released its Q4 2014 results on March 4, 2015—seven days before the close of the transaction—it revealed that its operating income EBIT beat its projections by 5.4%.[257] PetSmart also adjusted its non-GAAP adjusted diluted earnings per share estimate up to $1.43, exceeding its guidance and the $1.28 per share achieved for the prior year period.[258] PetSmart's comparable store sales grew from -.05% in Q2 2014, to flat in Q3 2014, to +2.6% in Q4 2014.[259] Revenue similarly grew from 1.4% in Q2 2014, to 2.6% in Q3 2014, to 6% in Q4 2014.[260]

The Merger Agreement was signed in the middle of Q4 2014, and Lenhardt, Teffner and Gangwal all testified that PetSmart's favorable Q4 performance did not change their views about the long-term prospects of the Company.[261] Indeed, in Q1 2015 (the quarter in which the Merger closed), PetSmart's comparable store sales growth dropped to 1.7%,[262] and remained below 2% throughout 2015.[263]

---

[257] JX 1350 at 12.

[258] JX 1447; Trial Tr. 1385:21–23 (Metrick).

[259] JX 630; JX 983; JX 1476.

[260] *Id.*

[261] Trial Tr. 272:18–274:19 (Teffner); Trial Tr. 447:4–11 (Gangwal); JX 1684 (Lenhardt Dep.) 63:10–65:19, 331:21–332:25.

[262] JX 1598 at PETS_APP00842050.

[263] *Id.*; JX 1619 at PETS_APP00820988; JX 1656 at PETS_APP00821452. *See also* Trial Tr. 1057:6–9 (Massey).

After the closing of the Merger, Lenhardt resigned and Massey became PetSmart's new President and CEO.[264] Massey quickly installed a new management team, changed PetSmart's organizational structure and created a new strategy for PetSmart based on his own revenue and cost initiatives.[265] While Massey used the Management Projections solely for purposes of management compensation,[266] his team created a new set of multi-year projections in July 2015.[267]

In 2015, PetSmart achieved $7.2 billion in total sales and $982.1 million in EBITDA.[268] PetSmart's comparable store sales growth, however, came in at 0.9%, missing the projected 1.5% growth forecast in the Management Projections by

---

[264] JX 1508.

[265] Trial Tr. 741:19–742:19 (Svider); Trial Tr. 1051:15–1055:13 (Massey). These new initiatives were informed by updated reports from PetSmart's consultants who identified for Massey additional savings they believed could be achieved. *See* Trial Tr. 348:16–350:6 (Teffner); JX 2022 at 5; JX 1286 at 18; PTO ¶ 388–393. *See also* JX 1286 at 7; Trial Tr. 342:24–346:16 (Teffner); JX 1684 (Lenhardt Dep.) 324:14–23.

[266] Trial Tr. 750:2–5, 750:14–22 (Svider).

[267] JX 1590 at PETS_APP00821375.

[268] JX 1656 at PETS_APP00821450–51, 57. I appreciate that PetSmart's post-closing performance is not relevant when assessing the Company's operational reality at the point of valuation—the date the merger closed. *Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 499 (Del. 2000). Petitioners argue, however, that PetSmart's post-closing performance is probative of the reliability of the management projections. I have considered this post-merger evidence for this limited purpose. *See id.* (holding that a court may consider post-merger evidence to the extent it relates to the validity of projections prepared prior to the merger).

40%.[269]  According to Massey, in 2016 year-to-date, the comparable store sales growth was -0.2%, in comparison to the projected growth in the Management Projections.[270]  The Company's EBITDA, however, exceeded the 2015 Management Projections by $200 million by the end of FY 2015.[271]  In February 2016, PetSmart was able to issue a dividend of $800 million which constituted a 38% return on invested capital.[272]

## N. Procedural Posture

Petitioners seek appraisal for 10,713,225 shares of common stock of PetSmart, 9,541,372 of which were acquired after the record date of the Merger.[273] Six appraisal petitions were filed on March 12 and 13, 2015, and all were consolidated by order dated April 30, 2015.[274]  A trial was held October 31 to November 3, 2016.  I heard post-trial oral argument on February 28, 2017, following post-trial briefing.

---

[269] *Id.*

[270] Trial Tr. 1057:6–9 (Massey).

[271] Trial Tr. 1119:16–20 (Massey); JX 1643 at 4; JX 1637 at 2.

[272] JX 1637 at 2; PTO ¶ 352; JX 1627 at 6.

[273] PTO ¶¶ 15–16, 18, 24–29, 31, 36–43, 45, 51, 53, 60–61, 63, 69–71.

[274] PTO ¶¶ 6–7.

Petitioners and Respondent both presented two experts at trial: one to address the reliability of the Management Projections and the other to address the fair value of PetSmart at the time of the Merger. I summarize their opinions briefly below.

### 1. The "Projections" Experts

Mark A. Cohen served as Petitioners' retail expert.[275] He focused on the credibility of the Management Projections and the outlook of PetSmart's business going forward.[276] Based on his analysis of the pet retail industry and PetSmart's prior performance, Cohen believes that PetSmart hit a "speed bump" just prior to the initiation of the sales process from which the Company would have rebounded. According to Cohen, PetSmart was not facing long-term growth issues.[277] He also opined that the Management Projections were created in line with industry standards and were reliable estimates of the Company's future cash flows.[278]

---

[275] JX 1692 (Cohen-Opening) at 1–3, App. 8–9.

[276] Cohen holds a B.S. in Electrical Engineering as well as a M.B.A. from Columbia University. He has an extensive history working in the retail industry, having worked for Abraham & Strauss, Gap Stores, Lord & Taylor, Mervyns Stores, Federated Department Stores, Bradlees Inc. and Sears Roebuck & Co. He served as Chairman and CEO of Sears Canada Inc. from 2001 to 2004. Since 2005, he has served as the Director of Retail Studies and Adjunct Professor of Retailing at Columbia University's Business School, maintains an independent consulting practice, and serves as a contributor for several news outlets. JX 1692 (Cohen-Opening) at 1–3.

[277] *See* JX 1692 (Cohen-Opening) at 28, 30, 33, 35–37.

[278] *Id.* at 38 ("PetSmart's 5-year financial projections were reasonably and reliably prepared in a manner consistent with industry standards.").

Mark Weinsten was retained by Respondent to provide an expert opinion on the Management Projections and related business plans created by the PetSmart management during the sales process.[279] Weinstein opined that the Management Projections were overly aggressive, overly optimistic and wholly unreliable.[280] In support of this opinion, he pointed to the facts that PetSmart's management was newly installed when they were directed to create the projections, they had no experience in creating long-term projections of future cash flows and they could not look to past examples of projections within PetSmart for guidance since PetSmart historically did not create long-term projections.[281] In those instances where management attempted to forecast future performance, even for quarterly forecasts, the Company regularly would underperform.[282]

---

[279] Weinsten holds a B.S. in economics from Carnegie-Mellon University and an M.B.A. from the Wharton School at the University of Pennsylvania. He is a Managing Director in the Corporate Finance Group at Berkeley Research Group, a global strategic advisory firm. His practice focuses on turnarounds and restructurings, and he specializes in serving in interim executive positions during transition phases. Prior to joining Berkeley Research Group, Weinsten served as Senior Managing Director in the Corporate Finance & Restructuring practice of FTI Consulting, Inc. JX 2307 (Weinsten-Opening) at 1–6, App. A.

[280] *See id.* at 6–7.

[281] *Id.*

[282] *Id.* at 42 ("Starting in 2013 through first half of 2014, Management had underperformed its quarterly forecasts—even short-term forecasts). *See also id.* at 43, Ex. 15.

According to Weinsten, the Management Projections were all the more sketchy given that they were prepared largely as top down forecasts, an approach not consistent with industry best practices, and were prepared specifically for a sales process with Board pressure to be more and more aggressive.[283] He also found specific areas of concern regarding the achievability of the forecasts, which included the comparable store sales growth projections and the ability of management successfully to execute on its overall business plans.[284]

## 2. The Valuation Experts

Petitioners' valuation expert was Kevin Dages.[285] Dages determined that a DCF analysis based on the Management Projections is the most reliable indicator of

---

[283] *Id.* "Top down is driven by management and starts with overarching goals, such as 3% revenue growth and 10% gross margin expansion, which are then pushed down to targets and quotas that are assigned down to employees. Bottoms up planning starts with teams of employees who develop plans for initiatives to improve the business, which are then passed on to management for review and approval and the aggregate result of all initiatives drives the overall company goals and targets. . . . [B]ottoms up planning typically yields more realistic and reliable results as it involves detailed planning by the people who will be responsible for executing on the initiatives." *Id.* at 45.

[284] *Id.* at 53 ("[I]t would have been difficult for Management to achieve the turnaround in comparable store sales growth reflected in the [Management Projections.]"); *id.* at 84 ("The ability to execute a plan hinges upon three critical components—people, processes and tools. At the time of development of the [Management Projections], PetSmart faced challenges with respect to all three components.").

[285] Dages is well-known to this Court. He holds a B.B.A. in accounting from the University of Notre Dame and is a Certified Public Accountant. He is an Executive Vice President of Compass Lexecon, a consulting firm specializing in the application of economics to legal and regulatory issues. JX 1698 (Dages-Opening) at 1.

the fair value of the Company. Based on his DCF analysis, Dages concluded that the fair value of PetSmart's common stock as of the date of the Merger was $128.78 per share.[286] Dages relied upon the Management Projections in all respects for his DCF analysis based upon Cohen's opinion that the projections "were reasonably and reliably prepared in a manner consistent with industry standards," as well as his own opinion that the Management Projections "represent the most reasonable set of projections [available] as to PetSmart's future performance."[287] Dages also acknowledged, however, that "once [he] signed onto the opinion of where the fair value is . . . based on these projections," he was, "at the end of the day," tied to the projections.[288] On the other hand, Dages recognized that if the Court finds that the Management Projections are not reliable, then it should not rely on his DCF

---

[286] In his DCF analysis, Dages used a perpetual growth rate of 2.25%, a WACC of 7.75% and a required investment in the terminal period of $47 million. JX 1698 (Dages-Opening) at 32–33; JX 1704 (Dages-Rebuttal) at Ex. 6D.

[287] JX 1698 (Dages-Opening) at 25–26. Dages noted, however, that "I'm not a retail guy so I didn't start with this is absolutely the right set of projections to go with, because I— you know, that's not my expertise." JX 1712 (Dages Dep.) 157:6–11.

[288] JX 1712 (Dages Dep.) 155:20–157:22 (Dages further explained that the Management Projections were "the best set of projections for me to start with and to examine sensitivities, and to then . . . reach an opinion about fair value, and since the opinion on fair value is based on this set of projections, then yes, I believe I'm wed to [the] answer [that the Management Projections are the best estimate of PetSmart's future performance]. . . . If my opinion was based on the 80 percent PIP scenario, then I think I would be telling you that the 80 percent PIP scenario is the best estimate of performance.").

valuation because that analysis assumed the accuracy of those projections.[289]  Stated differently, "[g]arbage in, garbage out."[290]

Dages performed a WACC-based DCF analysis in which he discounted the Company's free cash flows back to present value using the Company's weighted average cost of capital and then subtracted the value of the Company's debt to determine the value of its equity.[291]  He also ran the BCP Case, Massey Case and Bank Case through his DCF model—which, notably, all produced higher values than the DCF based on the Management Projections.[292]  In Petitioners' rebuttal case at trial, Dages presented a new DCF analysis he ran during trial based on the JPM sensitivities.[293]  This exercise yielded a value ranging from $102.82 to $112.90 per share.[294]

---

[289] Trial T7r. 624:14–19 (Dages).

[290] Trial Tr. 624:6–13 (Dages).

[291] JX 1697 (Metrick-Opening) at 107.

[292] *See* Trial Tr. 554:6–556:21 (Dages).  Using the BCP Case, Dages came up with a value of $137.00 per share.  Pet'rs' DX1 at 66.  With the Massey Case, Dages arrived at a value of $138.87 per share.  *Id.*  The Bank Case produced a value of $138.04 per share.  *Id.*

[293] Trial Tr. 1412:9–17 (Dages).

[294] Trial Tr. 1413:7–1420:12 (Dages); Pet'rs' DX2 at 1; Pet'rs' DX3 at 1; Pet'rs' DX4 at 1.

Dages rejected the $83 per share deal price as a reliable indicator of fair value for three main reasons.[295]  First, he believed the Merger Price was stale due to the three-month lag between the signing and closing of the deal.[296]  Second, he believed "the Board did not receive accurate or reliable valuation advice from J.P. Morgan" because JPM's DCF analysis was "results-driven" and biased.[297]  Finally, he found that the Merger Price was depressed due to the exclusion of Petco, the most logical strategic buyer, from the PetSmart auction, resulting in the participation of only financial bidders.[298]

Respondent's valuation expert was Andrew Metrick.[299]  According to Metrick, the Merger Price of $83 per share, achieved after a well-run active auction, is the most reliable indicator of PetSmart's fair value at the time of the Merger.[300] While he acknowledged that DCF is considered by many to be the "gold standard"

---

[295] *See* JX 1704 (Dages-Rebuttal) at 3.

[296] *Id.* at 6.

[297] *Id.* at 10.

[298] *Id.* at 14–23.

[299] Metrick is also no stranger to this Court.  He holds a Ph.D. and A.M. from Harvard University and a M.A. and B.A. from Yale University.  He is currently the Michael H. Jordan Professor of Finance and Management at the Yale School of Management.  Prior to that, he was on the faculty at the Wharton School at the University of Pennsylvania and at Harvard University, and served as Senior Economist and Chief Economist for the Council of Economic Advisers in Washington, D.C.  JX 1697 (Metrick-Opening) at 2.

[300] Trial Tr. 1244:14–1245:23 (Metrick).

of valuation tools, Metrick found that DCF was misleading here since the primary data input, the Management Projections, were entirely unreliable.[301] He explained that, for the purposes of a DCF analysis, "one must use the 'expected' (as opposed to 'hoped for') future cash flows of the business."[302] Based on his review of the evidence, Metrick opined that the Management Projections were unreliable because they were prepared specifically for the sale process (not in the ordinary course of business) by inexperienced management who were pushed to be overly optimistic.[303]

Nevertheless, for the sake of completeness, Metrick did perform a DCF analysis, but not with the Management Projections. Instead, he utilized his own adjustments to the revenue forecasts, starting with the JPM sensitivities.[304] He did not believe that PetSmart could achieve the $200 million in cost savings from the PIP indefinitely into the future, as projected by management, so he adjusted the projected PIP savings to decline linearly beginning three years after the savings are assumed to be fully realized, with only $59 million remaining in the terminal period.[305]

---

[301] Trial Tr. 1241:3–17, 1244:14–1245:8 (Metrick).

[302] JX 1697 (Metrick-Opening) at 60.

[303] *Id.* at 101–02.

[304] *Id*. at 102.

[305] *Id.* at 103.

After adjusting the Management Projections, Metrick created an APV-based DCF model that discounts the Company's free cash flows by the Company's unlevered cost of equity, adds the benefits of a tax shield obtained from the Company's debt, and then subtracts the value of the debt to determine the Company's equity value.[306] Metrick's DCF analysis resulted in a fair value of $81.44 per share. According to Metrick, his DCF valuation simply corroborates the most reliable indicator of PetSmart's fair value—the $83 per share Merger Price that followed a "deal process where (1) the sale [was] well publicized, (2) there [were] multiple bidders and a large number of interested parties, and (3) the incentives of the Board and management [were] aligned with those of the stockholders."[307]

Metrick asserts that his opinion regarding the fair value of PetSmart at the Merger Price is bolstered by the following confirmatory analyses: (1) his DCF analysis resulting in a value of $81.44 per share; (2) the fact that "[a]t no point prior to PetSmart's acquisition did its shares trade at or above $83 per share"; (3) the fact that "[a]t no point prior to the consummation of the transaction did analysts' average price target of PetSmart exceed $83 per share"; (4) a "valuation of PetSmart based on the trading multiples of comparable companies ranges from $70 to $112, with a

---

[306] *Id.* at 107–08. In his DCF analysis, Metrick used a 2% terminal growth rate, a WACC of 6.35% and a required investment in the terminal period of $222 million. *Id.* at 117–18, Ex. 21, Ex. 23.

[307] *Id.* at 142.

value below $91 (the median) [being] more appropriate based on PetSmart's operating metrics relative to the peers"; (5) a "valuation of PetSmart based on the recent acquisition of Petco is $69"; and (6) a "valuation of PetSmart based on prior transactions involving retailers ranges from $59 to $74."[308]

After trial, Metrick submitted a supplemental report to respond to Dages's DCF analysis based on the JPM sensitivities.[309] He determined that Dages's valuations corresponding to the sensitivities "are inflated significantly due to (i) an assumption that PetSmart has no fixed costs, meaning margins are unchanged as revenue declines in moving from the [Management Projections] to [the JPM sensitivities], and (ii) [the] failure to adjust the discount rate to reflect the lease treatment embedded in the cash flows."[310] Correcting for these errors, Metrick derived valuations from the JPM sensitivities ranging from $82.79 to $86.96.[311]

The driving difference in the valuations produced by Dages and Metrick can be traced most directly to the different projections of expected cash flows on which they rely.[312] Unlike many appraisal cases litigated in this court, the inputs utilized

---

[308] *Id.*

[309] JX 2315 (Metrick-Supplemental).

[310] *Id.* at 2.

[311] *Id.*

[312] *See* Trial Tr. 1272:2–5 (Metrick) ("In this particular case, Mr. Dages and I approached it in a broadly similar way and ended up with discount rates that were fairly similar.");

by the valuation experts involved here are relatively close. But there are differences.

Metrick capitalized all of PetSmart's current leases,[313] while Dages maintained the characterization of the leases from PetSmart's financial statements.[314] The experts agreed, however, that as long as the leases are treated consistently throughout the valuation analysis, the manner in which the leases are characterized should not affect the valuation substantially.[315] The other large difference between the two models is the terminal investment required.[316] Metrick used a model out of a McKinsey & Co.

---

JX 1704 (Dages-Rebuttal) at 4 ("Assuming the Court agrees that PetSmart's Management Projections are the appropriate basis for a fair value calculation, the range of expert opinions of fair value based on a DCF analysis would be $128.78 to $133.94 per share, with the $133.84 per share DCF value resulting from Professor Metrick's WACC and terminal period growth assumptions and the lower $128.78 per share DCF value coming from [Dages's] analysis."); JX 2028 (Metrick Dep.) 639:11–14 ("Q. But if I put the [Management Projections] through your model and his model, if we use the same models, we are going to come very, very close; correct? A. That is correct."). *See also* JX 1704 (Dages-Rebuttal) at 23 ("The heart of any free cash flow-based valuation analysis—either a WACC-based DCF or an APV-based DCF model – is the underlying financial forecast."). I note that while Dages uses a WACC-based DCF and Metrick uses an APV-based DCF, if the analyses are performed correctly, both models should yield substantially the same result. Trial Tr. 1274:9–15 (Metrick); JX 1704 (Dages-Rebuttal) at App. A ¶ 1. The two experts are also "in general agreement regarding the appropriate levered beta," though Dages derives his beta estimate from PetSmart's historical data and peer betas while Metrick combined the historical beta for PetSmart with an industry average. JX 1703 (Metrick-Rebuttal) at 34.

[313] Trial Tr. 1303:8–1304:3 (Metrick); Trial Tr. 636:6–15 (Dages).

[314] Trial Tr. 1371:24–1372:5 (Metrick); Trial Tr. 636:6–15 (Dages).

[315] *See* JX 2028 (Metrick Dep.) 639:5–10.

[316] *See* Trial Tr. 1302:16–20 (Metrick) ("But that essentially—this boils down the difference. On the DCF, we have a lot of things that are the same, but ultimately we

textbook to calculate the amount of investment necessary at the terminal period to support the projected growth during the terminal period, arriving at an investment rate of 28.6% in the terminal period.[317] This results in a required investment of $222 million.[318] Dages adopted the required terminal investment found in the Management Projections of $47 million.[319]

## II.   ANALYSIS

Petitioners and Respondent present two vastly different valuations of PetSmart as of the date of the Merger based on two binary views of the most reliable means by which to determine fair value—deal price versus a discounted cash flow analysis. The vast delta between the valuations generated by the parties' proffered methodologies raises red flags and suggests, perhaps, that neither is truly reflective of PetSmart's fair value. As the Court undertakes to discharge its duty (or burden) independently to determine fair value, therefore, the temptation to strike a balance between the competing positions is undeniable. The $4.5 billion that separates the parties certainly leaves much room for compromise. But the unique structure of the

---

disagree about what the right model is for this company in the long-run and what will happen to their returns.").

[317] Trial Tr. 1305:20–1307:21 (Metrick).

[318] Trial Tr. 1367:15–1369:4 (Metrick).

[319] Trial Tr. 572:22–574:10 (Dages); JX 1704 (Dages-Rebuttal) at Ex. 6D.

appraisal proceeding should not obscure the reality that the process is adversarial; the parties have presented evidence; and the Court's fact-finding and decision-making must be evidence based. Nor should the Court jump to the conclusion that both parties' valuations are off the mark simply because their positions on fair value are so incredibly divergent. Rather, the Court's first task, as I see it, is to drill down on the parties' positions to see if they are grounded in the evidence and in sound methodology. That assessment will take the Court a long way down the road of fulfilling its function to appraise the fair value of the shares of PetSmart. Only then can the Court discern the extent to which further valuation analyses may be required.

A proper examination of the parties' competing positions reduces to the following questions: (1) was the transactional process leading to the Merger fair, well-functioning and free of structural impediments to achieving fair value for the Company; (2) are the requisite foundations for the proper performance of a DCF analysis sufficiently reliable to produce a trustworthy indicator of fair value; and (3) is there an evidentiary basis in the trial record for the Court to depart from the two proffered methodologies for determining fair value by constructing its own valuation structure? I take up these questions below. But first I address the statutory framework within which the Court must operate.

## A. The Legal Standard for Appraisal

This action for appraisal is governed by the Delaware appraisal statute, which

directs that the Court

> Appraise the shares, determining their fair value exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with a fair rate of interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value, the Court shall take into account all relevant factors.[320]

The purpose of an appraisal action is to "provide equitable relief for shareholders

dissenting from a merger on grounds of inadequacy of the offering price."[321] The

court's prescribed task is to determine the fair value of the dissenters' shareholdings

as of the date of the merger.[322]

Appraisal is not subject to "structured and mechanistic procedure."[323] It is

"by design, a flexible process."[324] Accordingly, there are no presumptions in

---

[320] 8 *Del. C.* § 262(h).

[321] *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 296 (Del. 1996).

[322] *Id.*

[323] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983).

[324] *Golden Telecom, Inc. v. Global GT LP*, 11 A.3d 214, 218 (Del. 2010) (declining to adopt a rule requiring this Court to defer to the deal price in appraisal proceedings). *See also id.* (reiterating that appraisal is designed to be a flexible process and "declin[ing] to adopt a rule that binds public companies to previously prepared company specific data in appraisal proceedings," noting that the statute provides this Court with "significant discretion").

Delaware appraisal law that favor one valuation approach over another.[325] Instead, the fair value determination, by statutory design and mandate, must take into account "all relevant factors."[326] Every company is different; every merger is different.[327] These differences are enriched with "relevant factors" that must be accounted for in the search for fair value.

In the unique design of statutory appraisal, "[b]oth parties 'have the burden of proving their respective valuation positions by a preponderance of the evidence.'"[328]

---

[325] *See Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Gp., Ltd.*, 847 A.2d 340, 356–57 (Del. Ch. 2003) ("As I perceive it, I am free to consider all non-speculative elements of value, provided that I honor the fair value definition articulated by the Delaware Supreme Court. . . . I am empowered to come up with a valuation, drawing on what I reasonably conclude is the most reliable evidence of value in the record.").

[326] 8 *Del. C.* § 262(h).

[327] *See Merion Capital L.P. v. Lender Processing Servs., Inc.*, 2016 WL 7324170, at *16 (Del. Ch. Dec. 16, 2016) (recognizing that "[t]he relevant factors can vary from case to case depending on the nature of the company, the overarching market dynamics, and the areas on which the parties focus. . . . An argument may carry the day in a particular case if counsel advance it skillfully and present persuasive evidence to support it. The same argument may not prevail in another case if the proponents fail to generate a similarly persuasive level of probative evidence or if the opponents respond effectively.").

[328] *Highfields Capital, Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 42 (Del. Ch. 2007) (quoting *M.G. Bancorp., Inc. v. Le Beau*, 737 A.2d 513, 520 (Del. 1999)). *See also Lender Processing*, 2016 WL 7324170, at *12 ("Each party also bears the burden of proving the constituent elements of its valuation position by a preponderance of the evidence, including the propriety of a particular method, modification, discount, or premium. If both parties fail to meet the preponderance standard on the ultimate question of fair value, the Court is required under the statute to make its own determination.") (quoting Jesse A. Finkelstein & John D. Hendershot, *Appraisal Rights in Mergers & Consolidations*, 38–5th C.P.S. §§ IV(H)(3), at A-89 to A-90 (BNA)).

If neither party carries this burden, however, "the court must then use its own independent judgment to determine fair value."[329]

## B. Did the Auction for PetSmart Yield Fair Value?

"The concept of fair value under Delaware law is not equivalent to the economic concept of fair market value."[330] It is, rather, "a jurisprudential concept that draws more from judicial writings than from the appraisal statute itself."[331] The focus of the fair value calculation is on "the value of the company as a going concern, rather than its value to a third party as an acquisition."[332] Even so, in certain cases, based on the evidence presented, the fair market value for a company may be the best and most reliable indicator of fair value.[333] But this will only be so where the evidence reveals a market value "forged in the crucible of objective market

---

[329] *Taylor v. American Specialty Retailing Gp., Inc.*, 2003 WL 21753752, at *2 (Del. Ch. July 25, 2003).

[330] *Lender Processing*, 2016 WL 7324170, at *13 (quoting *Finkelstein*, 2005 WL 1074364, at *12).

[331] *Del. Open MRI Radiology Assoc., P.A. v. Kessler*, 898 A.2d 290, 310 (Del. Ch. 2006).

[332] *M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 795 (Del. 1999).

[333] *See, e.g.*, *Lender Processing*, 2016 WL 7324170, at *33; *Merion Capital LP v. BMC Software, Inc.*, 2015 WL 6164771, at *18 (Del. Ch. Oct. 21, 2015); *LongPath Capital, LLC v. Ramtron Intern. Corp.*, 2015 WL 4540443, at *24 (Del. Ch. June 30, 2015); *Merlin P'rs LP v. AutoInfo, Inc.*, 2015 WL 2069417, at *11 (Del. Ch. Apr. 30, 2015); *Ancestry.com*, 2015 WL 399726, at *24; *Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807, at *15 (Del. Ch. Nov. 1, 2013), *aff'd*, 2015 WL 631586 (Del. Feb. 12, 2015) (TABLE); *Union Ill.*, 847 A.2d at 364.

reality,"[334] meaning that it was the "the product of not only a fair sales process, but also of a well-functioning market."[335]

After years of striving for it, Vince Lombardi finally arrived at the understanding that perfection in human endeavors is not attainable.[336] Even in the best case, a process to facilitate the sale of a company, constructed as it must be by the humans that manage the company and their human advisors, will not be perfect.[337] For the reasons I explain below, I am satisfied that the process employed to facilitate the sale of PetSmart, while not perfect, came close enough to perfection to produce a reliable indicator of PetSmart's fair value.[338]

---

[334] *Unimation, Inc.*, 1991 WL 29303, at *17.

[335] *DFC*, 2016 WL 3753123, at *21. *See also Lender Processing*, 2016 WL 7324170, at *16 (collecting cases).

[336] Chuck Carlson, *Game of My Life: 25 Stories of Packer Football* (Sports Pub. 2004) (quoting Coach Lombardi as opening his first Packers team meeting in 1959, after twenty years of coaching, by saying: "Gentleman, we are going to relentlessly chase perfection, knowing full well we will not catch it, because nothing is perfect").

[337] *See AutoInfo*, 2015 WL 2069417, at *14 (observing that no "real-world sales process" will live up to "a perfect, theoretical model").

[338] *Lender Processing* identifies a number of structural factors that may be relevant when determining whether the merger consideration was a reliable indicator of the company's fair value including "meaningful competition among multiple bidders during the pre-signing phase," the availability of "adequate and reliable information" to participants in the auction, the "absence of any explicit or implicit collusion," and "the lack of a topping bid." 2016 WL 7324170, at *16–26. Of course, the court also recognized that the relevant considerations will be deal and company specific and that the court's focus will be sharpened by the arguments offered by counsel. *Id.* at *16. My analysis of the reliability

With guidance from Morgan Stanley, PetSmart's Board began the process of exploring strategic alternatives because the Company's "stock had taken [a] very significant decline from historical levels," the Company "was unhappy," and "[s]hareholders were speaking up. . . ."[339] When the Board ultimately decided to pursue a sale, it engaged another reputable investment bank, JPM, and created an Ad Hoc Committee of experienced independent directors to oversee the process. From the outset, the Board's orientation was to view a sale of the Company not as an inevitable outcome, but rather as one of several strategic alternatives that also included remaining standalone while pursuing new revenue and cost saving initiatives or pursuing a significant leveraged recapitalization.[340] If the price achieved in the auction was unsatisfactory, the Board was prepared to walk away from that process and pursue other alternatives.[341] And if the more active among the Company's stockholders were unhappy with the decision the Board ultimately made, the Board was ready to deal with the consequences of that reaction, including to take

_____

of deal price as a product of the efficacy of the sales process necessarily has been shaped by the arguments of counsel and the evidence they chose to present at trial.

[339] Trial Tr. 398:22–399:7 (Gangwal).

[340] JX 337; JX 339; Trial Tr. 400:7–16 (Gangwal).

[341] Trial Tr. 427:7–430:12, 439:11 (Gangwal).

on a proxy fight if necessary.[342]  It was in this environment that the auction for PetSmart was conducted.

In August of 2014, PetSmart announced to the world that it was pursuing strategic alternatives including a sale, so the whole universe of potential bidders was put on notice.[343]  The Board did not rush the sale; it did not receive final bids and make its final decision to sell the Company until December 2014.  By the time the gavel fell, JPM had contacted 27 potential bidders, including the three potential strategic partners it considered most likely to be interested in acquiring PetSmart's niche business.  In this regard, I note that the Board considered inviting the most likely strategic partner, Petco, into the process, but made the reasoned decision that, without a firm indication of interest from Petco, the risks of providing PetSmart's most direct competitor with unfettered access to PetSmart's well-stocked data room outweighed any potential reward.  Nevertheless, the evidence revealed that the Board held the door open for Petco to join the auction *if* it expressed serious interest in making a bid.  It never did.

Fifteen parties signed nondisclosure agreements and engaged in due diligence. PetSmart management made in-person presentations to thirteen suitors.  Thereafter,

---

[342] *See* Trial Tr. 405:8–406:2 (Gangwal).

[343] Trial Tr. 418:24–419:8 (Gangwal). *See also* PTO ¶ 219.

74

JPM received indications of interest from five bid groups. Two of those bidders joined forces so that three bid groups proceeded into the next round of bidding. Those three bid groups then engaged in further due diligence, receiving constant updates regarding PetSmart's financials and operations (including the progress of the PIP) and further presentations from PetSmart management.[344] There was no credible evidence presented that management, the Ad Hoc Committee, the Board or JPM colluded with or otherwise favored any bidder during the entirety of the process.[345]

When JPM directed the final-round bidders to submit "their best and final" offers, KKR/CD&R advised JPM they could not offer more than PetSmart's then-current trading price of approximately $78 per share.[346] Apollo then submitted a final bid of $81.50 per share. BC Partners submitted a bid of $83 per share, after JPM prodded it to bid against its own initial final bid of $82.50 per share. BC Partners' offer of $83 per share was higher than PetSmart stock had ever traded and reflected a premium of 39% over its unaffected stock price. With this bid in hand, the Board met on December 13, 2014, and carefully considered its strategic

---

[344] JX 984; JX 910 at PETS_APP00177993; JX 936; JX 934; JX 1200.

[345] *See Global GT LP* v. *Golden Telecom, Inc.* (*Golden Telecom I*), 993 A.2d 497, 507 (Del. Ch.), *aff'd*, 11 A.3d 214 (Del. 2010) ("an arms-length merger price resulting from an effective market check is entitled to great weight in an appraisal.").

[346] Trial Tr. 907:5–12 (Aiyengar).

options with the assistance of its financial and legal advisors. Only after engaging in an analysis of all options did the Board conclude that accepting the $83 per share offer provided the best opportunity to maximize value for PetSmart stockholders.[347]

The Proxy issued by PetSmart in advance of the stockholder vote on the Merger included the Management Projections. Even though the Board cautioned stockholders against relying too heavily upon these projections,[348] they were there nonetheless for any stockholder to run its own DCF analysis, just as Petitioners have done.[349] PetSmart also announced its Q4 2014 results which revealed at least some positive recent trends in PetSmart's performance. Despite these disclosures, between the announcement that BC Partners would acquire PetSmart and the closing, no topping bidder stepped forward. When the time came to vote, PetSmart's fully-informed stockholders overwhelmingly approved the Merger.

In the wake of this well-constructed and fairly implemented auction process, Petitioners are left to nitpick at the details and to invent certain prevailing market dynamics that they now claim acted as impediments to PetSmart realizing fair value in the Merger. Specifically, Petitioners point to the following confounders that

---

[347] Trial Tr. 439:11 (Gangwal) (The Board, in determining whether to accept BC Partners' offer of $83 per share "[was] looking at greater value if [it] could [get it]."). *See also* Trial Tr. 439:4–441:9 (Gangwal).

[348] JX 1336 at 38; Trial Tr. 324:7–15 (Teffner).

[349] *See* Pet'rs' Post-Trial Br. 53–54.

render deal price unreliable in this case: (1) restrictions on financing impeded the ability of bidders to bid as much as they might have otherwise been willing to pay; (2) the lack of strategic bidders left PetSmart at the mercy of financial sponsors and their "LBO models"; (3) PetSmart was forced into the sales process at a low point in its performance by the agitations of JANA; (4) the Board was ill-informed, (5) JPM was conflicted; and (6) the transaction price was stale by the valuation date. I address each in turn.

*First*, as for the contention that a seized credit market restricted the bids, the credible evidence says otherwise. While JPM had concerns in the late fall of 2014 that the credit markets may not allow the private equity bidders to attain the financing necessary to fully fund their bids, these concerns abated soon after Thanksgiving and prior to the submission of final bids. The record is devoid of any evidence that unavailable credit actually affected the amount any bidder was willing to offer for PetSmart. Both Aiyengar and Svider confirmed that in their testimony and I believe them.[350]

*Second*, while it is true that only financial sponsors submitted bids for the Company, the evidence is clear that JPM made every effort to entice potential strategic bidders and none were interested. Indeed, the Board would have been

---

[350] Trial Tr. 755:6–757:6 (Svider); Trial Tr. 917:4–918:10 (Aiyengar).

77

receptive to a deal with Petco if only it would have expressed a serious indication of interest. Importantly, the evidence reveals that the private equity bidders did not know who they were bidding against and whether or not they were competing with strategic bidders.[351] They had every incentive to put their best offer on the table.

Petitioners advance the argument that the "LBO model" will rarely if ever produce fair value because the model is built to allow the funds to realize a certain internal rate of return that will always leave some portion of the company's going concern value unrealized. Taken to its logical conclusion, of course, Petitioners' position would suggest that all private equity bidders employing the same model (assuming they strive for the same IRR as Petitioners contend they do) should have bid the same amount for PetSmart. This, of course, did not happen—as shown by the spread between KKR and CD&R's final verbal bid at $78 per share and BC Partners' winning bid at $83 per share. And while it is true that private equity firms construct their bids with desired returns in mind, it does not follow that a private equity firm's final offer at the end of a robust and competitive auction cannot ultimately be the *best* indicator of fair value for the company.[352]

---

[351] *Cf. Lender Processing*, 2016 WL 7324170, at *18 (observing that "if bidders perceive a sale process to be relatively open, then a credible threat of competition can be as effective as actual competition").

[352] *See, e.g.*, *Lender Processing*, 2016 WL 7324170, at *26–29 (relying on the merger price in a sale to a private equity buyer); *BMC*, 2015 WL 6164771, at *18 (determining that the deal price was the most reliable indicator of fair value in case involving sale to a group of private equity buyers); *AutoInfo*, 2015 WL 2069417, at *12 (same); *Ancestry.com*, 2015

*Third*, the notion that the Board was forced to sell after the emergence of an activist shareholder finds no credible support in the evidence. By the time JANA arrived on the scene in July 2014, PetSmart's Board had already begun the process of reviewing strategic alternatives with Morgan Stanley. Thereafter, PetSmart took its time with the sales process, not signing the Merger Agreement with BC Partners until December 2014. Indeed, the evidence reveals that all strategic alternatives were on the table in December 2014 and that the Board did not decide to sell until JPM was able to coax the final offer of $83 per share from BC Partners (actually causing it to bid against itself). Had the auction not generated an offer that the Board deemed too good to pass up, I am satisfied that the Board was ready to pursue other

WL 399726, at *23–24 (same); *CKx*, 2013 WL 5878807, at *13 (same). I note that the LBO model and DCF model both rely upon the same expected cash flows. The LBO model, however, is risk adjusted to account for post-transaction leverage. It follows, then, that the higher rate of return sought by bidders employing an LBO model will be offset by the fact that most of the purchase price is financed with debt which, in turn, creates a higher return on equity. Moreover, companies with a history of lagging performance may be valued more by financial bidders with a plan to turn around the company than strategic bidders who might be less inclined to take on that risk. Stated more simply, there are two sides to the "LBO model" argument. JX 1697 (Metrick-Opening) at 49–56; Trial Tr. 1277:4–1281:22 (Metrick). While there may be some intuitive appeal to Petitioners' argument that the requisite IRR embedded in the LBO model will drive lower valuations, the evidence in this trial record did not support that argument or demonstrate that this dynamic was in play during the auction for PetSmart. *Accord* Alexander S. Gorbenko & Andrey Malenko, *Strategic and Financial Bidders in Takeover Auctions*, 69 J. Fin. 2513, 2514–16, 2532 (2014) (conducting an analysis of values paid by strategic and financial bidders and concluding that both, on average, pay more than the company's value under current management and that, in the case of 22.4% of the targets within the sample, those targets, all "mature, poorly performing companies," were "valued more by an average financial bidder than by an average strategic bidder").

initiatives as a standalone company and to defend itself in a proxy contest against JANA and others if necessary.[353]

*Fourth*, Petitioners' argument that the Board was ill-informed is premised largely on the exploitation of director Gangwal's inability to recall at trial (nearly three years after the fact) certain details regarding PetSmart's PIP initiative. It is a stretch to point to a witnesses' lack of recall at trial regarding the details of a cost-savings initiative as evidence that the entire PetSmart Board was ill-informed regarding the sales process. This is especially so given that Gangwal was able to testify extensively regarding the Board's consideration of strategic alternatives, the sales process and the Board's deliberations during this period.[354] Petitioners also argue that the Board was ill-informed because it did not receive advice regarding the valuation of the Company if it remained standalone, but this is contradicted by the

---

[353] *See* Trial Tr. 405:8–406:2, 427:7–430:12, 439:11 (Gangwal). Nor does the evidence suggest that PetSmart was sold at a time of market or internal uncertainty. The market trends confronting PetSmart had been in place for some time and the Company's struggles were not of recent origin. *See*, *e.g.*, Resp't's RX-6 (displaying PetSmart's historical comparative store sales growth beginning Q1 2011, showing that comparable store sales growth declined continually from Q1 2012 through Q1 2014 and then continued to slide in 2015 after a minor uptick Q4 2014). *See also* JX 2307 (Weinsten-Opening) at 16–26 (describing the challenges facing PetSmart in the period leading up to the Merger). This is not a case like *DFC*, where the company was confronting acute regulatory uncertainty at the time it was sold. 2016 WL 3753123, at *22. PetSmart's Board was able to weigh the Company's options on a clear day and make the decision it believed was in the best interest of the Company and its stockholders.

[354] *See, e.g.*, Trial Tr. 410:10–20, 418:20–419:8, 437:2–441:9 (Gangwal).

evidence adduced at trial, including (but not limited to) JPM's presentation at the December 13 Board meeting.[355]

*Fifth*, as previously noted, the "conflicts" Petitioners rely upon to impugn the results of the sales process are hardly striking and, in any event, were fully disclosed to the Board and the Ad Hoc Committee. For example, Petitioners argue that JPM did not adequately disclose its previous relationships with potential private equity bidders. As Gangwal testified, however, as a large institutional bank, the Board knew and was not at all surprised that JPM naturally had ties to the large private equity funds interested in bidding on the Company.[356] While Petitioners contend that JPM did not disclose, and was hindered by, conflicts due to its involvement with the initial public offering that Petco pursued in the fall of 2015, the only record

---

[355] *See* Trial Tr. 908:14–910:23 (Aiyengar) ("[V]aluation was presented to the board at multiple different times here. I don't remember all the dates. But starting from—from the time the plan was finalized in September, I think most of the other board presentations . . . had some sort of valuation discussion."). *See also* JX 1158.

[356] *See In re Inergy LP*, 2010 WL 4273197, at *14 (Del. Ch. Oct. 29, 2010) (holding that financial advisor's "prior dealings" with counterparty to the proposed transaction "d[id] not show that [the transaction committee's] decision to retain [that advisor] . . . was unreasonable"); *Emerald P'rs v. Berlin*, 2001 WL 115340, at *7 n.17 (Del. Ch. Feb. 7) (rejecting argument that target banker's work for the buyer created a conflict of interest), *vacated on other grounds*, 787 A.2d 85 (Del. 2001); *Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*, C.A. No. 5402-VCS, at *87–88 (Del. Ch. May 13, 2010) (TRANSCRIPT) (noting that the presence of a conflict "doesn't mean that [the advisor] can't be the banker. . . . I'd rather have some of the best bankers with their conflicts disclosed than some of the worst bankers who don't have any conflicts"); *Dollar Thrifty*, 14 A.3d at 582 (noting that a company's investment bankers working with private equity bidders prior to a sales process was "one of the facts of business life").

evidence on this conflict shows that JPM did not pitch this project, much less get retained to work on it, until months after the PetSmart Merger closed.[357] Petitioners also point to JPM's prior relationship with Gangwal due to its involvement in taking his airline public, but I can discern no basis to characterize this relationship as a conflict or to conclude that it would have affected the advice JPM rendered to the PetSmart Board or its work in running the PetSmart auction.

*Finally*, the argument that the Merger Price was stale by the time of closing is at best speculative. Mergers are consummated after the consideration is set. That temporal separation, however, does not in and of itself suggest that the merger consideration does not accurately reflect the company's going concern value as of the closing date.[358] Here, Petitioners would have me conclude that the Merger Price was stale because, in the gap between signing and closing, PetSmart's fortunes took a miraculous turn for the better. While the record indicates that the Company did enjoy some favorable results in Q4 2014, such as an uptick in comparable store sales growth, I am not convinced that these short-term improvements were indicative of a long-term trend. In fact, all testimony at trial was to the contrary—the Board, as well as Teffner, believed that the Q4 results were temporary and provided no basis

---

[357] JX 1679 (Aiyengar Dep. Day 1) 29:5–9.

[358] *See Union Ill.*, 847 A.2d at 358.

to alter their view of the Company's long-term prospects.[359]  These perceptions were born out in Q1 2015 (when the Merger closed) during which PetSmart's comparable store sales dropped to 1.7%.[360]  At year end, PetSmart reported comparable store sales growth of 0.9%, a 40% miss from the Management Projections in just the first projection year.[361]

Respondent has carried its burden of demonstrating that the Merger Price of $83 per share was the result of a "proper transactional process"[362] comprised of a robust pre-signing auction in which adequately informed bidders were given every incentive to make their best offer in the midst of a "well-functioning market."[363]

---

[359] *See, e.g.*, Trial Tr. 447:4–7 (Gangwal) (Q. "And did [PetSmart's] performance in the fourth quarter [of 2014], did that in any way affect your view of the long-term value of the company?" A. "No."); Trial Tr. 273:24–24 (Teffner) (Q. "Did [PetSmart's Q4 2014] results change your view of the long-term prospects of the company?" A. "No." Q. "Why not?" A. "Because it was one quarter."). Petitioners contend that PetSmart's Q4 2014 results were released too close to the closing of the Merger for potential bidders to digest them. This ignores the fact that bidders were constantly updated regarding PetSmart's performance, so they received information about PetSmart's Q4 performance in real time well before the market. *See, e.g.*, JX 1090; Trial Tr. 263:7–20 (Teffner); Trial Tr. 735:17–737:21 (Svider).

[360] JX 1598 at PETS_APP00842050.

[361] JX 1656 at PETS_APP00821450–51, 57.

[362] *Ramtron*, 2015 WL 4540443, at *21.

[363] *DFC*, 2016 WL 3753123, at *21.

Under these circumstances, I am satisfied that the deal price is a reliable indicator of fair value.[364]

## C. Can a DCF Analysis that Relies Upon the Any of the Projections In the Record Produce a Reliable Indicator of Fair Value?

My determination that the $83 per share Merger Price is a reliable indicator of fair value does not end the inquiry. To discharge my statutory obligation to consider "all relevant factors," it is necessary that I consider the reliability of the other valuations of PetSmart in the trial record.[365]

Petitioners peg DCF as the "gold standard" of valuation tools.[366] To be sure, that is precisely how Metrick has described it.[367] This court, likewise, has turned to a DCF analysis in the appraisal context to determine fair value and, in certain circumstances, has deemed the results of a DCF analysis to be the only reliable

---

[364] *BMC*, 2015 WL 6164771, at *11 (observing that the court may rely upon "the merger price itself as evidence of fair value, so long as the process leading to the transaction is reliable indicator of value and any merger-specific value in that price is excluded."). I note that there is no need or basis to adjust the Merger Price in recognition of either positive or negative synergies associated with the combination of PetSmart and BC Partners since the buyer here "was a financial buyer rather than a strategic acquirer," *DFC*, 2016 WL 3753123, at *20 n.230, and there was no evidence presented that synergies unique to private equity sponsors were present here. *See* Lawrence A. Hamermesh & Michael L. Wachter, *Rationalizing Appraisal Standards in Compulsory Buyouts*, 50 B.C. L. Rev. 1021, 1050 (2009) (discussing synergies financial buyers may have with target firms arising from other companies in their portfolio and reduced agency costs).

[365] *Gonsalves*, 701 A.2d at 362.

[366] Pet'rs' Post-Trial Br. at 14.

[367] JX 1714 (Metrick Dep.) 245:17-19; Trial Tr. 1317:10–21 (Metrick); JX 63 at 14.

indicator of fair value.[368] Even though I am confident that the deal price in this case is a reliable indicator of fair value, I have approached the DCF valuations performed by the parties' experts with an open mind.[369]

> A proper DCF analysis follows a well-defined sequence:
>
> First, one estimates the values of future cash flows for a discrete period, based, where possible, on contemporaneous management projections. Then, the value of the entity attributable to cash flows expected after the end of the discrete period must be estimated to produce a so-called terminal value, preferably [by] using a perpetual growth model. Finally, the value of the cash flows for the discrete period and the terminal value must be discounted back using the capital asset pricing model or 'CAPM.'[370]

The first key to a reliable DCF analysis is the availability of reliable projections of future expected cash flows, preferably derived from contemporaneous management projections prepared in the ordinary course of business.[371] As this court has determined time and again, if the "data inputs used in the model are not reliable,"

---

[368] *See, e.g.*, *Owen v. Cannon*, 2015 WL 3819204, at *29 (Del. Ch. June 17, 2015); *Golden Telecom I*, 993 A.2d at 499.

[369] I note that both valuation experts agree that no other valuation methodology (*e.g.*, comparable company or comparable transaction analyses) would make sense here, particularly given the rather unique nature of PetSmart's retail business. *See* JX 1698 (Dages-Opening) at 73; JX 1697 (Metrick-Opening) at 142. I agree and will not discuss these methodologies further.

[370] *Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at *9 (Del. Ch. Aug. 19, 2005) (citation omitted).

[371] *See Merion Capital, L.P. v. 3M Cogent, Inc.*, 2013 WL 3793896, at *11 (Del. Ch. July 8, 2013); *Ramtron*, 2015 WL 4540443, at *10. *See also* JX 1697 (Metrick-Opening) at 106–07; JX 1698 (Dages-Opening) at 23–24.

then the results of the analysis likewise will lack reliability.[372] And, as the experts in this case both agree, to be reliable, management's projections should reflect the "expected cash flows" of the company, not merely results that are "hoped for."[373]

## 1. The Projections

Petitioners like the Management Projections and maintain they are reliable indicators of PetSmart's future performance. Respondent, on the other hand, finds itself in the presumably uncomfortable position of having to argue that its own projections cannot be trusted as a basis for predicting expected cash flows and, therefore, cannot provide a sound foundation for a DCF analysis. While I appreciate that the parties' disagreement with respect to the reliability of the Management Projections presents a question of fact that must be answered by the evidence in this case, I take guidance from other instances where this court has examined the reliability of projections used for the purposes of appraisal. Specifically, this court has deemed projections unreliable where "the company's use of such projections was unprecedented, where the projections were created in anticipation of litigation,

---

[372] *Ramtron*, 2015 WL 4540443, at *10. *See also id.* at *18 (stating that where there are no "reliable five-year projections, any values generated by a DCF analysis are meaningless"); *CKx*, 2013 WL 5878807, at *11 (noting that "methods of valuation, including a discounted cash flow analysis, are only as good as the inputs to the model"); *Andaloro*, 2005 WL 2045640, at *9 (noting that this court may give a DCF analysis great weight in an appraisal proceeding "when it may be used responsibly"). Dages agrees. Trial Tr. 624:6–13 (Dages) ("Garbage in; garbage out.").

[373] *See* Trial Tr. 621:2–8 (Dages); Trial Tr. 1240:18–23 (Metrick).

where the projections were created for the purpose of obtaining benefits outside the company's ordinary course of business,"[374] where the projections were inconsistent with a corporation's recent performance,[375] or where the company had a poor history of meeting its projections.[376]

The Management Projections upon which Petitioners rely are saddled with nearly all of these telltale indicators of unreliability: (1) PetSmart management did not have a history of creating and, therefore, had virtually no experience with, long-term projections; (2) even management's short term projections frequently missed the mark; (3) the Management Projections were not created in the ordinary course of business but rather for use in the auction process; and (4) management engaged in the process of creating all of the auction-related projections in the midst of intense pressure from the Board to be aggressive, with the expectation that the projections would be discounted by potential bidders. As explained below, each of these factors undermine the credibility of Dages's DCF results.

*First*, PetSmart had not historically created five-year projections prior to the creation of the auction-related projections (including the Management Projections).

---

[374] *CKx*, 2013 WL 5878807, at *9.

[375] *See In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *41 (Del. Ch. Sept. 4, 2014) (citing *Kahn v. Household Acq. Corp.*, 591 A.2d 166, 175 (Del. 1991)).

[376] *Nine Sys.*, 2014 WL 4383127, at *42.

PetSmart's forecasting practice was limited to the creation of annual budgets in connection with the Summer Strategy meetings. These budgets were nothing like the five-year projections management was directed to prepare when the Board decided to explore a sale of the Company. The Summer Strategy budgets were one-year forecasts prepared to support particular proposed initiatives with the anticipation that they would be revised throughout the year as events unfolded.[377] While Vance made her own long-term projections based on the annual budgets created as a part of Summer Strategy, her model was never presented to or relied upon by PetSmart's management or Board.[378]

The Board's request that management shift from preparing one-year budgets to five-year cash flow projections was made all the more difficult by the fact that PetSmart's senior management were new to their jobs. Teffner, who was leading the effort, had only been in her job for about a year; Lenhardt had only taken on the role of CEO in June 2013. And, of course, the projections were rush jobs; the Board

---

[377] Trial Tr. 208:4–209:3 (Teffner). *See also* Trial Tr. 34:1–23 (Cohen) (Petitioners' retail expert testifying that retail operates on a one-year cycle, so that creating detailed projections beyond one-year made little sense).

[378] Trial Tr. 213:7–19 (Teffner) (explaining that Vance's model "was not presented to management, was not presented to the board for approval; [instead it] was more of an inherent working tool for the planning department, but it wasn't considered a multiyear projection that the business relied upon").

wanted the work product in a matter of weeks to ready the Company for the sales process.[379]

*Second*, while management had no history of preparing long-term projections, it did have a history of preparing short-term forecasts that did not accurately predict Company performance.[380] As demonstrated in the following chart produced in Metrick's opening expert report, even PetSmart's reforecasts were often off by large margins:[381]

| | FY13 | | | | | FY14 | |
|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | FY | Q1 | Q2 |
| **F1** | 3.80% | 3.90% | 4.10% | 4.30% | 4.00% | 1.50% | 2.90% |
| **F2** | | 3.70% | 4.00% | 4.90% | 4.10% | | 0.80% |
| **F3** | | | 4.00% | 4.90% | 4.00% | | |
| **F4** | | | | 3.50% | | | |
| **Actual** | 3.50% | 3.40% | 2.70% | 1.20% | 2.70% | -0.60% | -0.50% |
| **Actual - F1** | -0.30% | -0.50% | -1.40% | -3.10% | -1.30% | -2.10% | -3.40% |
| **Actual − F2** | | -0.30% | -1.30% | -3.70% | -1.40% | | -1.30% |

*Third*, the evidence reveals that management did not believe that the projections they were preparing actually offered reliable predictions of future

---

[379] Trial Tr. 219:9–22, 229:2–13, 236:8–16 (Teffner).

[380] *See Ramtron*, 2015 WL 4540443, at *11 (discounting the reliability of management projections since their ability to be accurate forecasters "more than two quarters out was quite poor" and noting that "management's lack of success in accurately projecting future revenue in the past provides another reason to doubt the reliability of the Management Projections"); *AutoInfo*, 2015 WL 2069417, at *8 (finding it significant in its assessment of the reliability of management projections that "[m]anagement itself had no confidence in its ability to forecast").

[381] JX 1697 (Metrick-Opening) at 65, Fig. 11.

performance. They were told to "put their best foot forward" and that is precisely what they did.[382] This, of course, is no surprise since they were told by the Board that their jobs depended on it.[383]

*Finally*, the evidence makes clear that the Management Projections were created specifically to aid PetSmart in its pursuit of strategic alternatives, including a sale of the Company. To fulfill this purpose, the projections were created to be aggressive and extra-optimistic about the future of the Company.[384] In fact, the Management Projections projected a reversal of several downward trends, including with regard to the important metric of comparable store sales growth estimates.[385] As Teffner, Gangwal and Aiyengar testified at trial, the projections were designed to be aggressive because the Board (and JPM) were convinced that potential bidders would discount whatever projections were put in front of them. This makes perfect

---

[382] Trial Tr. 368:14–16 (Teffner) ("[The Management Projections were] our best foot forward to potential buyers around the performance of the company, given the initiatives."). *See also* Trial Tr. 242:10–243:2, 256:7–17, 260:5–261:10, 268:9–269:5, 270:1–11, 370:19–23 (Teffner).

[383] JX 671 at PETS_APP00215455.

[384] JX 1674 (Vance Dep.) 135:5–137:3.

[385] JX 1684 (Lenhardt Dep.) 275:14–21. *See also* JX 2307 (Weinsten-Opening) at Ex. 8 n.52.

sense when projections are being prepared not in the ordinary course but to facilitate a sale of the Company.[386]

Petitioners argue that management knew where to draw the line between reliable and unreliable projections as evidenced by management's decision not to share the super-aggressive "Growth Case" with the Board. According to Petitioners, the fact that management was willing to provide the Management Projections to the Board reveals that management stood behind them and that they can trusted as a reliable input for a DCF analysis. I disagree. The Management Projections were the product of aggressive prodding by the Board for more optimistic forecasts and everyone involved in their creation knew that. Indeed, when the time came for the Board to look to JPM for valuation guidance, the Board directed JPM to run *only* downside sensitivities on the Management Projections.[387]

Petitioners next argue that the reliability of the Management Projections is bolstered by the Company's performance after the Merger Agreement was signed and post-closing. Here again, I disagree. To hear Petitioners tell it, PetSmart's post-signing performance was nothing short of a turnaround miracle.[388] The trial record

---

[386] It should also be noted that management's projections were "top down" rather than "bottom up" projections, which is contrary to best practices. JX 2307 (Weinsten-Opening) at 6–7.

[387] Trial Tr. 434:16–436:19 (Gangwal).

[388] Specifically, Petitioners contend, "PetSmart outperformed the projections immediately, with that outperformance accelerating from signing through, and well after, closing."

says otherwise. PetSmart's success, both post-signing and post-closing was and has been mixed. It is true that PetSmart's EBITDA exceeded the Management Projections for 2015 and that PetSmart was able to issue a $800 million dividend by year end. It is also true, however, that in both 2015 and 2016 (as of the date of trial), PetSmart's comparable store sales growth was massively underperforming the numbers forecast in the Management Projections.[389] Hardly a turnaround miracle.

Petitioners point to the PIP and argue that no matter the "aggressiveness" of the Management Projections, they must be considered in the context of the "cushion" provided by the substantial estimated cost savings PetSmart would realize from this initiative. In this regard, Petitioners point out that while PetSmart repeatedly reported that it would achieve $200 million in cost savings annually from the PIP, various internal documents set the actual estimates between $183–$283 million.[390]

---

Pet'rs' Post-Trial Br. 44. *See also id.* at 47 ("PetSmart's post-closing performance . . . blew the Management Projections out of the water.").

[389] Petitioners argue that Respondent is unduly "fixated" on the comparable store sales growth. *See id.* at 48–53. However, the PetSmart financial model was premised largely on this important growth metric. Indeed, management appeased the PetSmart Board's desire to make the projections for the sale process more aggressive by increasing the comparable store sales growth from the Base to the Base-Plus Cases to the final Management Projections. *See* JX 598 at PETS_APP00611653, 656; JX 798 (Comp_Trend tab). Suffice it to say, I am satisfied that "comp" is an important metric to measure performance and growth. In any event, whether or not the comparable store sales growth is important for the long-term prospects of the Company, as the parties dispute, based upon the evidence adduced at trial, this metric was indisputably central to the creation of the Management Projections and therefore directly indicative of their reliability.

[390] Trial Tr. 338:22–339:10 (Teffner).

The suggestion is that the extra $83 million was a cushion to offset any undue optimism in the Management Projections. Petitioners make too much of the range of PIP savings identified at various times by management. When the rubber hit the road, and management was pressed to provide optimistic but arguably achievable forecasts of PIP savings, management determined that, in their best estimate, $200 million was what was actually achievable.[391] The PIP was layered into the Management Projections and I see no basis in the evidence to conclude that some additional phantom savings were ready to be mined out of PetSmart beyond those already accounted for.[392]

For all of these reasons, I find that the Management Projections are not reliable statements of PetSmart's expected cash flows. Any DCF analysis that relies upon the Management Projections, therefore, would produce "meaningless" results.[393]

---

[391] Trial Tr. 339:23–340:11 (Teffner). Petitioners also point to other cost-savings proposals created by consultants estimating even greater savings, arguing that the consultants found an additional $473–$685 million in cost savings. Pet'rs' Post-Trial Br. 32. There is no evidence that PetSmart management ever thought these pitches from the paid consultants were actually achievable. For his part, Massey explicitly rejected the consultants' pitches as providing any meaningful input for a valuation of PetSmart because they were nothing more than "ideas." Trial Tr. 1105:1–5, 1106:5–1107:1 (Massey).

[392] JX 807 at PETS_APP00000690; JX 728.

[393] *CKx*, 2013 WL 5878807, at *9 ("[W]ithout reliable five-year projections, any values generated by a DCF analysis are meaningless."). *See also id.* at *11 n.113 ("If I were to apply a DCF analysis in this matter, by choosing between speculative revenue estimates . . . I would simply lend a faux-mathematic precision to a patently speculative enterprise: I would become, to use Twain's memorable locution, no better than a hair-ball oracle."); *Ramtron*, 2015 WL 4540443, at *18 (determining that there were no reliable five-year

Even though I have determined that the Management Projections cannot support a meaningful DCF analysis, I must consider the possibility that a reliable valuation of PetSmart nevertheless can be constructed from other evidence in the record. In addition to the Management Projections, Dages has looked to other projections—namely the BCP Case, the Massey Case, and the Bank Case—as foundations for alternative DCF analyses.[394] And on the final day of trial, Dages presented rebuttal testimony regarding a new DCF analysis he had performed based on the JPM sensitivities.

Metrick initially declined to run of any these projections through his DCF model. Instead, he created his own forecasts for PetSmart by adjusting the Management Projections, based on the 2% comparable store sales growth assumption adopted in the JPM sensitivities, and then further adjusting to account for the eventual decline of the PIP savings he believed would be realized further into the forecast. As the last word from the valuation experts, however, Metrick

projections in the record, and therefore declining to rely upon a DCF analysis); *Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *7 (Del. Ch. May 20, 2004) (declining to use a DCF analysis to value a company where the record did not contain any reasonably reliable contemporaneous projections of the company's future cash flows, rendering "a DCF analysis of marginal utility as a valuation technique").

[394] To be clear, Dages performed a DCF analysis with Management Projections and the Bank Case in his initial report. JX 1698 (Dages-Opening) at 59, 65. He prepared his DCF on the BCP Case and the Massey Case in advance of his direct testimony at trial. Trial Tr. 554:7–556:21, 603:1–4 (Dages).

responded post-trial to Dages' last-minute DCF analysis by pointing out its shortcomings and running his own analysis on the unadjusted JPM sensitivities. The questions remain whether any of these projections represent the expected future cash flows of the Company and whether any DCF based on these projections can be trusted as a reliable indicator of PetSmart's fair value at the time of the Merger.

When faced with unreliable contemporaneous management projections, this court has adopted other contemporaneous projections as a basis for a DCF analysis where it is satisfied that those projections provide a reliable estimate of the company's future cash flows.[395] But the projections must be contemporaneous, meaning they must reflect the "operative reality" of the Company at the time of the Merger.[396] A DCF analysis does not work in the appraisal context when the projections reflect the "operative reality" of the company in the hands of the acquirer.[397] With this in mind, it is easy to see why none of the projections prepared

[395] *See, e.g.*, *AutoInfo*, 2015 WL 2069417, at *15.

[396] *Highfields Capital*, 939 A.2d at 42 ("The corporation subject to valuation is viewed as a going concern based upon the operative reality of the company at the time of the merger. This value must be reached regardless of the synergies obtained from the consummation of the merger, and cannot include speculative elements of value arising from the merger's accomplishment or expectation.") (internal quotation marks and citations omitted).

[397] *Id. See also Cede & Co. v. JRC Acq. Corp.*, 2004 WL 286963, at *7 (Del. Ch. Feb. 10, 2004) (rejecting one party's valuation expert's attempt to use the debt incurred in the merger as a justification for his debt-to-equity ratio in his DCF analysis because nothing relating to the merger itself "can be included as an element of value").

outside of PetSmart can produce a reliable DCF result. Each reflect various scenarios of how PetSmart would be run under BC Partners' management with a variety of different assumptions. The BCP Case and the Massey Case both were designed with the idea that PetSmart would be run as a private, rather than a public company, with new management, new initiatives and Massey at the helm.[398] While BC Partners believed that Massey might be able to turn PetSmart around, it had no such confidence in PetSmart's current management.[399] Given BC Partners' plan to overhaul PetSmart management and its lack of faith in the current management, it

---

[398] Trial Tr. 741:19–742:22 (Svider) (describing the complete management turnover that BC Partners believed was necessary at PetSmart, as "it was our view that in order to turn this business around, you needed to implement very profound changes to the management team" so that once the Merger closed, BC Partners "basically changed not only the whole top management, but you know, pretty much the whole management of the company"). *See also* JX 1236 at BC00043779–93 (detailing Massey's loyalty, store associate behavior, product optimization, product expansion, marketing and merchandising, net price, supply chain and freight, consumable vendors negotiations, Asia sourcing, field payroll, overhead, occupancy cost and other operating, general and administrative initiatives); Trial Tr. 1027:7–11; 1030:8–1045:3 (Massey) (describing his proposed initiatives and how they differed from current management's initiatives); Trial Tr. 1041:23–1042:12 (Massey) (stating that, after a meeting where they discussed current management's progress on its initiatives, "I had a lot of concern. Many of the initiatives didn't seem to have much backing them up. And what was really concerning were the—a number of the senior managers really couldn't articulate how they were going to execute these things. Some could, and some did a very good job. But some of the most important ones in merchandising and marketing, we had walked away with a lot of concerns"); Trial Tr. 1048:3–22 (Massey) (describing his worries about the achievability of his plan leading up to the consummation of the Merger because "I had serious doubts about relying on the people, a number of the people. There were a lot of good people, but there [were] other people I was very concerned about. And I knew I would have to make a tremendous amount of change").

[399] *Id. See also* JX 1676 (Svider Dep.) 38:6–9, 145:14–23.

strains credulity to argue that the cases BC Partners created showed expected cash flows if PetSmart were to continue operating as a going concern sans Merger.

The Bank Case prepared by BC Partners fares no better. The assumptions upon which those projections are based resemble nothing of PetSmart's operative reality. To reiterate, the Bank Case was created for BC Partners to present to potential lenders, not in the ordinary course of business, with the purpose of showing that "if things get tough . . . you can run the business for cash."[400] It assumed that the Company would cut capital expenditures in its efforts to preserve cash with the implicit understanding that this approach would stymie long-term growth.[401] Simply stated, the Bank Case did not reliably state expected cash flows because that was not its purpose.

Having determined that the Management Projections, the BCP Case, the Massey Case and the Bank Case are not reliable statements of PetSmart's expected future cash flows, it should come as no surprise that I reject outright the DCF analyses Dages performed using those projections as foundation.[402] They are patently not reliable indicators of fair value.

---

[400] Trial Tr. 743:21–746:4 (Svider) (describing the purpose of a bank case).

[401] *Id.*

[402] *Ramtron*, 2015 WL 4540443, at *18 (holding that a DCF analysis built on unreliable projections is "meaningless").

That leaves the possibility of undertaking some adjustments to the Management Projections to bring them in line with the Company's expected cash flows as a means to supply reliable data for a DCF analysis. Both parties have submitted a DCF analysis based on the JPM sensitivities.[403] Metrick has gone a step further by making further adjustments to the JPM sensitivities to account for his view that the PIP savings will not be sustainable indefinitely.[404] Even though Dages appears to have referred to the JPM sensitivities as an afterthought, his DCF based on those projections is in the record and must be addressed.

The Board requested that JPM run sensitivities based on 2% comparable store sales growth because it had "a great amount of discomfort" with the 4% comparable store sales growth utilized in the Management Projections, and thought that "2 percent looked more achievable." [405] Given the pressure the Board had placed upon management to prepare increasingly aggressive projections, it is reasonable that the Board would seek to gain a more realistic understanding of PetSmart's expected cash flows and its going concern value as the hour approached for the Board to make impactful decisions about PetSmart's future. While the evidence is

---

[403] Trial Tr. 1411:23–1429:18 (Dages); JX 1697 (Metrick-Opening) at 108–09; JX 2315 (Metrick-Supplemental) at 1.

[404] JX 1697 (Metrick-Opening) at 103.

[405] Trial Tr. 436:13–19 (Gangwal).

a bit light with respect to the bases for the 2% adjustment in comparable store sales growth selected by the Board, I take comfort that the adjustment was conceived by an informed, experienced Board and then analyzed carefully by an informed, experienced banker.  It is also not lost on me that the JPM sensitivities are the only projections utilized, in some form at least, by both of the valuation experts engaged by the parties.  They bear sufficient indicia of reliability to justify further consideration of the valuations based on the data contained therein.

### 2.  The Expert Valuations Based on the JPM Sensitivities

Dages performed his rebuttal DCF on the JPM sensitivities to respond to testimony from Aiyengar and Gangwal to the effect that the Board directed JPM to make adjustments to the Management Projections that would cause them to reflect more accurately PetSmart's future performance.[406]  For this analysis, Dages took the cash flows from the JPM sensitivities and ran them through a DCF analysis applying the inputs derived from both his and Metrick's prior DCF analyses—the discount rate (or WACC), the perpetual growth rate and the terminal investment.[407]  First, he applied his perpetual growth rate of 2.25%, WACC of 7.75% and terminal

---

[406] Trial Tr. 1412:9–1414:19 (Dages).

[407] Trial Tr. 1415:19–1416:5, 1416:15–21 (Dages).

investment of $41 million.[408]  Across the three JPM sensitivities, this resulted in a value ranging from $102.82 to $112.90 per share.[409]

Dages then ran a DCF analysis using the inputs he attributed to Metrick "based on [the] exhibits" Metrick utilized during his trial testimony—a perpetual growth rate of 2.0% and WACC of 6.35%.[410]  Dages calculated the terminal investment for each of the sensitivities using the same formula that Metrick had used for each sensitivity during his testimony.[411]  Across the JPM sensitivities, this resulted in a value ranging from $108.13 to $118.88 per share.[412]

Metrick had already seized on the import of the JPM sensitivities in his initial report.[413]  He adjusted the Management Projections to reflect the 2% comparable store sales growth estimate for years after FY15.[414]  He further adjusted the Management Projections, which assumed that PetSmart would achieve the cost

---

[408] Pet'rs' DX 2 at 2; Pet'rs' DX 3 at 2; Pet'rs' DX 4 at 2.

[409] *Id.*

[410] Trial Tr. 1413:19–1414:3 (Dages); Pet'rs' DX 2 at 3; Pet'rs' DX 3 at 3; Pet'rs' DX 4 at 3.

[411] Trial Tr. 1417:6–17, 1420:2–12 (Dages); Pet'rs DX 2 at 3; Pet'rs' DX 3 at 3; Pet'rs' DX 4 at 3.  Dages used real rates in this method, whereas Metrick had used nominal rates. Trial Tr. 1413:4–6.

[412] Pet'rs' DX 2 at 3; Pet'rs' DX 3 at 3; Pet'rs' DX 4 at 3.

[413] JX 1697 (Metrick-Opening) at 102.

[414] *Id.* at 102–03.

savings envisioned by the PIP infinitely, to account for his view "that the cost savings EBITDA improvements will decline beginning in FY19, three years after the savings are assumed to be fully realized in FY16."[415] He then incorporated his assumption that "the annual savings will decline linearly to the Base Case Amount ($59 million) by the terminal period, which begins in FY25."[416]

The projected decreases in PIP savings represented Metrick's best attempts to estimate how long and to what extent PetSmart would retain the projected benefits.[417] He based his opinion that PetSmart would not realize the PIP savings infinitely on "economic theory, market response to the PIP, and industry experience related to cost reduction programs."[418] Of particular relevance was a McKinsey & Co. study that found 90% of 230 S&P 500 firms that had engaged in cost-savings strategies between 1999 and 2003 had failed to sustain the lower cost savings beyond three years.[419] Additionally, Metrick believed that increasingly strong competition

---

[415] *Id.* at 103.

[416] *Id.*

[417] Trial Tr. 1403:4–21 (Metrick).

[418] JX 1697 (Metrick-Opening) at 103.

[419] JX 24 at 108–11. This is also consistent with Weinsten's experiences. Trial Tr. 1206:9–19 (Weinsten).

from other pet retailers—*i.e.*, Petco—would cause the cost savings to erode over time.[420]

Metrick returned to the JPM sensitivities when he responded to Dages's rebuttal DCF valuations.[421]  He ran his own DCF analysis on the JPM sensitivities (without adjustments) to reveal the errors in Dages's DCF on those same projections.[422]  Metrick found two principal faults with Dages's rebuttal DCF.  First, he took Dages to task for using the improper discount rates.  In this regard, he began with the premise that "[t]o value the cash flows properly, the discount rate must reflect the assumed capital structure, which in turn depends on how leases are treated in the cash flows."[423]  According to Metrick, the discount rates Dages utilized are not consistent with the capital structure assumed in his analysis.  Specifically, Dages treated the leases as operating leases (as reflected in the JPM sensitivities), which

---

[420] JX 1697 (Metrick-Opening) at 94–95.

[421] JX 2315 (Metrick-Supplemental) at 1. I note for clarity that the JPM sensitivities are the cash flows from JPM's valuation model, and therefore distinct from the adjustments that Metrick made to the Management Projections to reflect his view of the expected cash flows for the DCF he performed in his initial report. *See id.* at 3.

[422] *Id.* at 2.  Metrick focused on Sensitivity #2 "for simplicity" because, given the assumptions in Sensitivity #3 and Sensitivity #4 regarding new store growth, his DCF analysis on Sensitivity #2 would result in a higher valuation for PetSmart. *Id.* at 1. Since the differences across the sensitivities are assumptions regarding new store growth, Metrick's criticisms of Dages' DCF analysis would apply equally to all three sensitivities he analyzed. *Id.*

[423] *Id.* at 5.

results in a capital structure with no debt (and 100% equity).[424] And yet the WACC utilized by Dages, pulled from his initial report, is based on a capital structure of 8% debt and 92% equity.[425] Similarly, the WACC Dages attributed to Metrick in his rebuttal DCF was based on Metrick's assumption of a capital structure of 31% debt and 69% equity.[426] Given the very different capital structure assumed in the JPM sensitivities, Metrick opines that Dages should have used a WACC of 8.17% based on his own beta and equity risk premium, not 7.75%.[427] The proper WACC based on Metrick's assumptions should have been 7.7%, not 6.35%.[428]

Metrick's second criticism of Dages focuses on his use of income projections that "assume that all of PetSmart's costs are completely variable, rising or falling in proportion to sales, so profit margins do not change" even though the JPM sensitivities (based on the Management Projections) include specific fixed expense line items that will not vary with declining sales.[429] To adjust for this, Metrick took

---

[424] *Id.* at 6.

[425] *Id.*; JX 1698 (Dages-Opening) at 58, Ex. 21. *See also id.* at 33 (noting that a company's WACC is "based on the company's expected or target capital structure, that is, the relative proportion of debt and equity ownership").

[426] JX 2315 (Metrick-Supplemental) at 6.

[427] *Id.*

[428] *Id.*

[429] *Id.* at 6–7 (citing JX 1723 at row 128 of 'Financial Build' tab; JX 1697 (Metrick-Opening) at 109).

the fixed costs he found in the Management Projections and treated "all other costs as variable in implementing the 2% comparable store sales growth assumption."[430]

Metrick then ran a DCF based upon JPM Sensitivity #2, which assumes that PetSmart will open new stores according to current management plans through 2019 and will have no new store growth thereafter.[431] In this DCF model, he used his terminal investment formula to calculate the required investment in the terminal period using a 2.0% perpetual growth rate.[432] Applying his adjusted Dages WACC of 8.17% (as adjusted to reflect the capital structure assumed by the cash flows), Metrick then performed a DCF using the cash flows found in Sensitivity #2 resulting in a valuation of $82.79 per share.[433] Using his own adjusted WACC of 7.77%, Metrick's DCF analysis using Sensitivity #2 results in a valuation of $86.96 per share.[434]

As explained above, I have found the JPM sensitivities to be the most reliable projections in the record before me – the question now is what to do with the various

---

[430] *Id.* at 7.

[431] *Id.* at 1; JX 1336 at 35.

[432] JX 2315 (Metrick-Supplemental) at 7–8, 8 n.18; JX 1697 (Metrick-Opening) at 115–117. Both Dages and Metrick chose inflation for the perpetual growth rate; they just chose two different rates of inflation. Trial Tr. 537:4–10 (Dages).

[433] JX 2315 (Metrick-Supplemental) at 8. *See also id.* at 6 n.14, Ex. 4.

[434] *Id.* at 8. *See also id.* at 6 n.15, Ex. 3.

DCF analyses constructed by the experts based upon these projections. While I agree with Metrick's criticism of any projection that extends the PIP cost savings out indefinitely into the future, I find no support in the evidence for the specific adjustments that he makes to the PIP cost savings in his initial report. The theory is sound, and I agree that it is not reasonable to assume that the PIP savings will continue at $200 million annually through the terminal period, but there is insufficient evidence in the record to allow me to assess when the PIP cost savings will begin to fade and at what levels. Therefore, I am not persuaded that Metrick's initial DCF valuation, based on his adjustments to the Management Projections, offers a reliable indicator of fair value.[435]

This leads me to the experts' competing analyses based on the JPM sensitivities. I agree with Metrick's criticism of the rebuttal DCF analysis Dages presented at trial—the WACC must accurately reflect the capital structure indicated by the cash flows, and the costs should accurately reflect the fixed costs. I am also convinced that Metrick's formula for calculating the required amount of investment to support the terminal growth rate is proper, as it is supported by economic theory, finance literature and even testimony that Dages offered to this court in a prior

---

[435] To be fair, Metrick performed his DCF as a fallback. His showcase opinion is that the Merger Price of $83 per share reflects fair value and that DCF is not a reliable indicator of value in this case. Trial Tr. 1268:21–1269:8 (Metrick).

case.[436] Metrick's formula demonstrates that PetSmart's return on invested capital will converge towards its cost of capital, a theory this court has repeatedly cited with approval.[437] In contrast, and in contrast to his past practice, Dages merely adopted the terminal investment from the Management Projections, which would imply that PetSmart would permanently see returns on capital far above its cost of capital.[438] That premise is not credible, at least not to me.

I also find Sensitivity #2 to be the most reliable of the three JPM sensitivities, as this reflects the current management plan for new store sales growth. Accordingly, I am satisfied that the DCF analysis performed by Metrick in his supplemental report is the most reliable DCF that can be performed with the data available. As noted, this analysis reveals a valuation of PetSmart ranging from

---

[436] JX 2315 (Metrick-Supplemental) at 7–8, 8 n.18; JX 1697 (Metrick-Opening) at 115–117; JX 1233 at 29–31; JX 1691; Trial Tr. 714:10–21 (Dages).

[437] *See, e.g.*, *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2011 WL 227634, at *4 n.16 (Del. Ch. Jan. 14, 2011) (stating that the convergence model is "a reflection of the widely-accepted assumption that for companies in highly competitive industries with no competitive advantages, value-creating investment opportunities will be exhausted over a discrete forecast period, and beyond that point, any additional growth will be value-neutral" leading to the "return on new investment in perpetuity [converging] to the company's cost of capital"); *Cede & Co. v. Technicolor, Inc.*, 1990 WL 161084, at *26 (Del. Ch. Oct. 19, 1990), *consolidated with Cinerama, Inc. v. Technicolor, Inc.*, 1991 WL 111134 (Del. Ch. June 24, 1991), *and aff'd in part and rev'd in part on other grounds*, 634 A.2d 345 (Del. 1993) (discussing that "profits above the cost of capital in an industry will attract competitors, who will over some time period drive returns down to the point at which returns equal the cost of capital").

[438] Trial Tr. 572:22–574:10 (Dages); Trial Tr. 1299:3–1302:24 (Metrick); JX 1691.

$82.79 to $86.96 per share (depending upon whether one applies the adjusted Dages WACC or the adjusted Metrick WACC).  Given my lack of confidence in the Management Projections underlying the JPM sensitivities, however, I am not inclined to adjust my view that the fair value of PetSmart at the time of the Merger is best reflected in the $83 per share Merger Price.  The DCF analyses performed by Metrick on the JPM Sensitivity #2 are, however, confirmatory.

**D. Does the Evidence Provide a Basis for Alternative DCF Analyses?**

As a final step in discharging my duty to consider "all relevant factors," I have looked to the record to determine if there is any basis to make further adjustments to the projections or to alter the inputs used by the experts to arrive at a more reliable DCF analysis.  I am satisfied that no such basis exists.  The JPM sensitivities provided the most reliable evidence in the record of the actual, expected future cash flows of the Company.  And while they are not perfect, I find nothing in the evidence that would allow me credibly to adjust these projections further.  Nor do I find a basis to alter the experts' inputs.  The DCF models they constructed were not that dissimilar.  Where they differed, I found Metrick's explanations for his approach, in this case, to be credible.  I see no reason to alter the work he performed.

I have considered all relevant factors.  I state my final decision below.

# III. CONCLUSION

Accepting Petitioners' contention that the fair value of PetSmart was $128.78 per share would be tantamount to declaring that a massive market failure occurred here that caused PetSmart to leave nearly $4.5 billion on the table. In the wake of a robust pre-signing auction among informed, motivated bidders, and in the absence of any evidence that market conditions impeded the auction, I can find no basis to accept Petitioners' flawed, post-hoc valuation and ignore the deal price. Nor can I find a path in the evidence to reach a fair value somewhere between the values proffered by the parties. And so I "defer" to deal price, not to restore balance after some perceived disruption in the doctrinal Force, but because that is what the evidence presented in this case requires.[439]

---

[439] I cannot help but observe, however, that reliance upon the deal price as a reliable indicator of fair value in this case, where the paid experts have offered such wildly different opinions on the subject, does project a certain elegance that is very appealing. In an arm's-length transaction like the one here, the buyer and seller are both incented to value the company as accurately as they can knowing that "they [will be] penalized in the marketplace" for failing to do so. *See* Daniel R. Fischel, *Market Evidence in Corporate Law*, 69 U. Chi. L. Rev. 941, 943 (2002). "Paid experts in litigation who testify about values derived from analyzing comparables or discounting future cash flows to present value, [on the other hand], have very different incentives." *Id.* Given this dynamic, Delaware courts must remain mindful that "the DCF method is [] subject to manipulation and guesswork [and that] the valuation results that it generates in the setting of a litigation [can be] volatile. . . ." William T. Allen, *Securities Markets as Social Products: The Pretty Efficient Capital Market Hypothesis*, 28 J. Corp. L. 551, 560 (2003). The Merger Price, negotiated at arm's-length, in real time, after a well-run pre-signing auction that takes place in the midst of a fully functioning market, is not burdened by such litigation-driven confounding influences.

For the foregoing reasons, I have found the fair value of PetSmart shares at the date of the closing of the Merger to be $83 per share.  The legal rate of interest, compounded quarterly, shall accrue from the date of closing to the date of payment. The parties should confer and submit an implementing order within ten days.